**GIRL SCOUTS OF THE UNITED STATES OF AMERICA and Boy Scouts of America, Plaintiffs,**

**v.**

**The BANTAM DOUBLEDAY DELL PUBLISHING GROUP, INC. d/b/a Dell Publishing and Judy Delton, Defendants.**

No. 89 Civ. 1194 (LMM).

United States District Court, S.D. New York.

Dec. 21, 1992.

Bert A. Collison, Nims, Howes, Collison & Isner, New York City, for plaintiffs.

Richard Dannay, David O. Carson, Schwab Goldberg Price & Dannay, New York City, for defendants.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

Plaintiffs Girl Scouts of the United States of America and Boy Scouts of America ("Plaintiffs", "Girl Scouts" or "Boy Scouts") instituted this action on February 17, 1989 against defendants Bantam Doubleday Dell Publishing Group, Inc. and Judy Delton ("Defendants"), the publisher and author of a series of children's books (currently sixteen in number), bearing the title "Pee Wee Scouts" along with various subtitles. Plaintiffs allege that Defendants' use of the words "scout," "scouting," and related terms in the titles and texts of their publications (1) infringe Plaintiffs' registered trademarks and service marks in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114 (1988), (2) infringe Plaintiffs' common law trademarks and service marks in violation of the New York State law of unfair competition, (3) falsely represent and designate the origin or sponsorship of such books in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and (4) will injure Plaintiffs' business reputation and tend to dilute the quality of Plaintiffs' trademarks and service marks in violation of Section 368–d of the New York General Business Law (McKinney 1984). Plaintiffs seek injunctive relief and damages. Now before this Court is Defendants' second motion for summary judgment brought pursuant to Federal Rule of Civil Procedure ("Fed. R.Civ.P.") Rule 56 or, in the alternative, for an order certifying an immediate interlocutory appeal under 28 U.S.C. § 1292(b). For the reasons set forth below, Defendants' motion for summary judgment is granted.

After answering the complaint, Defendants moved for summary judgment pursuant to Fed.R.Civ.P. Rule 56. That motion was denied by Judge Patterson in an Opinion and Order dated October 10, 1989. *Girl Scouts of the U.S.A. v. Bantam Doubleday Dell Publishing Group, Inc.*, 1989 WL 122769, 1989 U.S.Dist.LEXIS 12054 (S.D.N.Y.1989). In that first motion, Defendants argued that they were entitled to judgment as a matter of law because Defendants' books are protected by the free

speech and free press guarantees of the Constitution's First and Fourteenth Amendments and that these interests outweigh the statutory and common law trademark interests of Plaintiffs under the balancing test applicable when trademark and other commercial interests conflict with the First Amendment. Judge Patterson isolated the critical legal issue as whether the interest in preventing consumer confusion outweighs First Amendment concerns. He denied Defendants' motion, finding that, while the ultimate determination of whether likelihood of confusion exists is a question of law, the factors to be used in making the determination involve factual issues. He concluded that Plaintiffs raised genuine issues of material fact on the issue of likelihood of confusion; based on these factual issues and because no discovery had taken place, he found that it would be premature to engage in an assessment of the factors to be used in weighing consumer confusion and First Amendment concerns. *Id.* at * 5, 1989 U.S.Dist.LEXIS at * 16– * 17. In an Order dated October 25, 1989, Judge Patterson denied Defendants' motion for reargument or for certification under 28 U.S.C. § 1292(b).

Defendants' second motion for summary judgment, now before this Court, is founded on two changes in circumstances. First, Defendants argue that because discovery has now been completed, additional facts are established and the time is therefore ripe for the Court to decide their summary judgment motion. Moreover, Defendants' current motion expands upon the First Amendment defenses raised in its first summary judgment motion. Specifically, Defendants seek summary judgment on the merits of Plaintiffs' trademark and unfair competition claims as well as on their First Amendment defenses.

## BACKGROUND

### A. *Plaintiffs Boy Scouts and Girl Scouts*

Both the Girl Scouts and the Boy Scouts have been prominent organizations in American life since they began their operations early in the century. The principle purpose of both organizations is to supplement the formal education of young girls or boys with a structured environment incorporating social, athletic, outdoors and creative activities.

The Girl Scouts was first incorporated in 1915 and was subsequently incorporated by a special Act of Congress in 1950. 36 U.S.C. §§ 31–39.[1] Approximately 3.3 million girls and young women, as well as 788,000 adult leaders and participants, in over 200,000 troops nationwide, are currently involved with the Girl Scouts. Over 55 million women and girls have been members of the Girl Scouts since its inception. The young women and girls engage in various character-building activities,[2] participation in which earns them badges in such activities as camping, community services, and selling cookies door-to-door. Members are organized into troops which meet weekly, they recite a pledge, and they wear uniforms for certain activities, sometimes including a scarf worn around the neck. The Girl Scouts are divided into groups by age, beginning with kindergartners who are called Daisy Girl Scouts. As second and third graders, the girls become Brownie Scouts and, in grades four through six,

1. Section 36 gives the Girl Scouts certain exclusive rights. It provides:
 The corporation shall have the sole and exclusive right to have and to use, in carrying out its purposes, all emblems and badges, descriptive or designating marks, and words or phrases now or heretofore used by the old corporation ... in carrying out its program, ....

2. Section 33 of the Act incorporating the Girl Scouts lists its purposes:
 The purposes of the corporation shall be to promote the qualities of truth, loyalty, help-

fulness, friendliness, courtesy, purity, kindness, obedience, cheerfulness, thriftiness, and kindred virtues among girls, as a preparation for their responsibilities in the home and for service to community, to direct and coordinate the Girl Scouts movement in the United States ... and to fix and maintain standards for the movement which will inspire the rising generation with the highest ideals of character, patriotism, conduct, and attainment, which purposes shall be nonsectarian, nonpolitical, and not for pecuniary profit.

they are Junior Girl Scouts. Young women may continue on to the Cadette Girl Scout level and finally to Senior Girl Scouts and Campus Girl Scouts.

The Girl Scouts have the following registered trademarks or service marks: Girl Scouts, Campus Girl Scouts, Brownie, and Daisy Girl Scouts, Girl Scout Cookies, Scout Cookies, and Cadette Girl Scout.[3] (Pl. Pretrial Mem. at 4–9.)

■ The Boy Scouts was first incorporated in the United States in 1910 and was then incorporated by a Special Act of Congress in 1916. 36 U.S.C. § 21–29.[4] Current Boy Scout membership totals 4.2 million youths and 1.1 million participating adults in 130,000 organizational units. Approximately 100 million boys and adults have been Boy Scout organization members since its founding in 1910. The Boy Scouts' purpose is to build good character in its young charges.[5] Boy Scouts also meet weekly, participating in activities commensurate with the organization's purpose, often to earn badges. Important elements of the Boy Scouts organization are the Scout Oath, Scout Motto and Scout Law recited by members and the uniforms worn, including a neckerchief. The age

divisions of the Boy Scouts are Tiger Cubs, boys aged six, Cub Scouts, boys in the second through the fifth grades, and, for older boys, Boy Scouts, including Varsity Scouts, Explorer Scouts, Eagle Scouts, Official Scouts, and Sea Scouts.[6] In addition to their alleged common law trademarks and service marks, the Boy Scouts have secured registrations in the U.S. Patent and Trademark Office for the following: Boy Scouts of America, Cub Scouts, Scouting (a magazine for adult Boy Scout leaders), Scouting/USA, National Scout Jamboree, Varsity Scout, and Eagle Scout Association.[7] The Boy Scouts, as well as the Girl Scouts, have used the terms "scout" or "scouts" alone or in combination with other words to indicate various indicia and activities of their organizations.

Books, catalogs, and magazines are some of the numerous products marketed by the Boy Scouts in connection with its activities. Examples include: the Official Boy Scout Handbook, the Big Bear Cub Scout Book, and a monthly magazine entitled *Boys Life*. *Boys Life* magazine runs a comic strip about a fictional Boy Scout named Pee Wee Harris and his troop.[8] Plaintiffs do not

**3.** The trefoil design has been a common designation of the organization and its products. The trademarks and designations have been used in connection with various products, notably clothing and handbooks. Plaintiffs claim that many terms using the word "Scout" have been commonly employed by the Girl Scouts in carrying out their activities; for example: "Scout Oath," "Scout Law," "Scout Sign," "Scout Motto," "Scout Badge," "Scout Uniform," "Scout Activities," "Scouting Organization," "Scout," "Scouting," etc.

**4.** Section 27 employs the same language as 36 U.S.C. § 36, relating to the exclusive right to emblems, badges, marks, and words or phrases. *See supra* n. 1.

**5.** 36 U.S.C. § 23 lists the Boy Scouts' purposes: The purpose of the corporation shall be to promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which were in common use by Boy Scouts on June 15, 1916.

**6.** The fleur-de-lis logo is commonly used to designate the Boy Scouts organization or particular

activities. *See supra* Note 3 for a list of terms Plaintiffs claim are used by the Boy Scouts as well as the Girl Scouts in connection with their activities.

**7.** Defendants note, and Plaintiffs do not dispute, that in Boy Scouts' registration for Varsity Scout, dated November 12, 1985, the organization accepted the express disclaimer that "No claim is made [by the Boy Scouts] to the exclusive right to use 'Scout,' apart from the mark as shown." The Boy Scouts accepted this disclaimer at the suggestion of the U.S. Patent and Trademarks Office (PTO). They also disclaimed the word "scout" in registering for National Eagle Scout Association (Sept. 21, 1982). (Pl.Pretrial Mem. at 7.) Plaintiffs contend that the disclaimers are irrelevant to the claim they have brought. *See* § 6(b) Lanham Act, 15 U.S.C. § 1056(b); *In re National Data Corp.*, 753 F.2d 1056, 1059 (Fed.Cir.1985). This Court is in accord with Plaintiffs' argument on this point.

**8.** Plaintiffs report that they have an application for registration of a Boy Scouts' mark for Pee Wee Harris now before the PTO (Serial No. 73/106114). (Def.Pretrial Mem. at 12–13.)

assert a separate claim with respect to the word or name "pee wee." (*See* Compl. at ¶¶ 10–11, 13) The Girl Scouts have also marketed printed matter in connection with the organization's activities, consisting primarily of handbooks and catalogs. For many years until the late 1970s, the Girl Scouts published the magazine *American Girl.*

Both the Boy Scouts and the Girl Scouts go to great lengths to promote their activities through print, radio and television advertisements, often done free of charge and worth many thousands of dollars per year. Unsolicited media coverage and recognition by government officials of the Boy Scouts' and Girl Scouts' many activities contributes, along with advertising, to unprecedented public awareness of Plaintiffs' organizations.

### B. *Defendants Judy Delton and Dell Publishing*

Judy Delton is the author and Dell Publishing is the publisher of a series of illustrated children's books under the series title "Pee Wee Scouts".[9] On the cover of each book, the author's and illustrator's names and the publisher's name and logo appear prominently, along with the "Pee Wee Scouts" general title and the book's specific title. In addition, in the lower right hand corner of each book is an inset with a drawing of a red scarf held together by a pin bearing the name "Pee Wee Scouts." On the back cover of each book is a cut-out merit badge, presumably associated with the scouting activity described in the book, e.g. camping. Defendants have also published a promotional 11–page "Official Pee Wee Scouts Handbook," which provides the background of the Pee Wee Scouts and includes cut-out badges.

The books are fictional short stories about a co-ed group of first and second graders, all members of Troop 23 of the Pee Wee Scouts. In the course of the books, the children engage in activities such as camping, attending regular weekly meetings, doing good deeds, earning merit badges, celebrating holidays, selling doughnuts, attending a Pee Wee jubilee, playing sports, gardening, learning about health and fitness, doing arts and crafts, etc. At their meetings, the children sing their Pee Wee Scout Song and recite the Pee Wee Scout Pledge.

Plaintiffs allege that the plots of certain of the books contain elements very closely associated with the Boy Scouts or Girl Scouts. For example, the book entitled "Pee Wee Jubilee" involves a large gathering of scouts from different states, similar to the nationwide Boy Scout Jamborees held every four years. In another book, the troop leader consults a "Pee Wee Scout Handbook" to ascertain whether one of the children may earn a badge for a certain activity. Plaintiffs' similar scouting handbooks are well-known.

The activities and purposes of the Pee Wee Scouts thus resemble in various respects those of the Boy Scouts and Girl Scouts. The boys and girls who form the Pee Wee Scouts are referred to as such or as "Pee Wees" or "Scouts," but never as Boy Scouts or Girl Scouts or any other name used by Plaintiffs such as Daisy Scouts or Cub Scouts.

### DISCUSSION

### A. *Appropriateness of Summary Judgment*

Summary judgment under Fed.R.Civ.P. Rule 56 will be granted if the movant establishes that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Therefore, this Court is precluded from trying issues of fact on a summary judgment motion. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987) (citations omitted). A court must resolve all ambiguities and draw all reason-

---

**9.** Sixteen "Pee Wee Scouts" books have been published as of May 1992. They each have an individual title, as follows: Cookies and Crutches; Camp Ghost–Away; Lucky Dog Days; Blue Skies, French Fries; Grumpy Pumpkins; Pea- nut–Butter Pilgrims; A Pee Wee Christmas; That Mushy Stuff; Spring Sprouts; The Pooped Troop; The Pee Wee Jubilee; Bad Bad Bunnies; Rosy Noses, Freezing Toes; Sonny's Secret; Sky Babies; and Trash Bash.

able inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

As numerous cases in the Second Circuit demonstrate, the issues present in this trademark action may be decided as a matter of law. *See, e.g., Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 580 (2d Cir.1991). The Memoranda submitted by Plaintiffs and Defendants demonstrate that they substantially agree that three issues are facing this Court on Defendants' motion. First, Defendants claim, and Plaintiffs dispute as a legal matter, that this action is completely barred by the First and Fourteenth Amendments. Defendants in trademark infringement cases have been granted summary judgment where First Amendment concerns were prevalent. *See, e.g., Rogers v. Grimaldi,* 875 F.2d 994, 998 (2d Cir.1989); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.,* 886 F.2d 490, 494–95 (2d Cir.1989); *New Kids on the Block v. News America Publishing, Inc.,* 745 F.Supp. 1540 (C.D.Cal.1990).

Second, the parties dispute whether Plaintiffs have the exclusive right to the term "scout" and "scouting" in the titles or text of children's fiction, and, third, the parties dispute whether the public is likely to be confused as to the source or sponsorship of Defendants' books. In trademark cases where First Amendment concerns are absent, summary judgment has been granted despite the variety of factors frequently at issue in trademark infringement actions. *See,* e.g., *Lang,* 949 F.2d 576. The Second Circuit's eight-factor test requires the weighing of all of those factors, each often involving substantial factual issues. *See Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *see infra* for a discussion of the factors.

■ Neither the volume of evidence nor the complexity of the case should preclude a grant of summary judgment if otherwise appropriate. *See Lang,* 949 F.2d at 580 (*"some* alleged factual dispute ... will not

defeat ... motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact"); *Continental Corrugated Container Corp. v. Continental Group, Inc.,* 462 F.Supp. 200, 209 (S.D.N.Y.1978) (in trademark infringement case "complexity of a case is not necessarily a barrier to summary judgment"). In weighing the *Polaroid* factors in a summary judgment motion, a court must examine "not how many factors favor each side but whether a reasonable trier of fact might differ as to the likelihood of confusion." *Physicians Formula Cosmetics Inc. v. West Cabot Cosmetics, Inc.,* 857 F.2d 80, 85 (2d Cir.1988).

As set out below, even interpreting all of the relevant evidence brought to light as of the close of discovery in the manner suggested by Plaintiffs, Defendants nonetheless must prevail in their summary judgment motion. The factors articulated by Judge Patterson as dispositive in his denial of Defendant's first motion for summary judgment—at which time certain facts had not been clarified by discovery—are adjudged by this Court to have been resolved through discovery in a manner sufficient to support summary judgment on First Amendment grounds.

## B. *First Amendment Grounds*

■ Artistic expression frequently conflicts with intellectual property rights. The owner of a trademark does not possess a property right that is superior to the First Amendment right accorded to artistic expression. *See L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26, 29 (1st Cir.), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987). Commentators have noted that courts frequently overprotect trademarks at the expense of First Amendment interests. Diane Leenheer Zimmerman, *Information as Speech, Information as Goods: Some Thoughts on Marketplaces and the Bill of Rights,* 33 Wm. & Mary L.Rev. 665, 673, 720 n. 356 (1992); Rochelle Cooper Dreyfuss, *Expressive Genericity: Trademarks as Language in the Pepsi Generation,* 65 Notre Dame L.Rev. 397, 398 (1990) (finding First Amendment law

has proven "uncongenial" as means to limit trademark rights and proposing framework to further expressive uses of trademarks by third parties); Robert C. Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols*, 1982 Wis.L.Rev. 158, 202 (1982) (First Amendment defense should be recognized in cases where defendant "has a message, and the trademark assists in conveying it").

"To prevent filmmakers, novelists, painters, and political satirists from including trademarks in their works is to cordon off an important part of modern culture from public discourse." Robert N. Kravitz, *Trademarks, Speech, and the Gay Olympics Case*, 69 B.U.L.Rev. 131, 152 (1989). The case before this Court involves expression obviously implicating First Amendment concerns, *see Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 231, 97 S.Ct. 1782, 1797, 52 L.Ed.2d 261 (1977); as explained *infra*, a trademark owner cannot circumscribe the mark's use beyond a relatively narrowly defined area where consumer confusion is substantial.

■ This Court grants Defendants' motion for summary judgment on the basis of *Rogers v. Grimaldi.* 875 F.2d 994. The Plaintiffs allege that Defendants' books infringe their registered marks in violation of § 32(1) [10] and § 43(a) [11] of the Lanham Act. To prevail in their trademark claim, Plaintiffs must show that they have a protectable mark, and "that 'an appreciable number of ordinary prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question.'" *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 75 (2d Cir.1988) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)).

In evaluating whether ordinary purchasers are likely to be misled, a court is to consider the eight factors articulated in *Polaroid.* The factors are: the strength of the prior owner's mark, the similarity between the two marks, the competitive proximity of the products, the likelihood that the prior user will bridge the gap, actual confusion, the defendant's good faith, the quality of the defendant's product, and the sophistication of the buyers. *Polaroid*, 287 F.2d at 495.

As explained in *Rogers v. Grimaldi*, the *Polaroid* analysis changes when the First Amendment is implicated. First Amendment concerns do not, of course, negate the protection afforded by trademark law. The Second Circuit in *Rogers* articulated the conflict underlying the balancing test it announced therein. "Movies, plays, books, and songs are all indisputably works of artistic expression and deserve protection. Nonetheless, they are also sold in the commercial marketplace like other more utilitarian products, making the danger of consumer deception a legitimate concern that warrants some government regulation." *Rogers*, 875 F.2d at 997.

The *Rogers* case involved plaintiff Ginger Rogers, the famed show business star, who sued the producers and distributors of the film "Ginger and Fred," a fictional film about two minor Italian cabaret performers named Pippo and Amelia who, in their heyday, had imitated Fred Astaire and plaintiff Ginger Rogers. Plaintiff brought several claims, including a Lanham Act § 43(a) claim, alleging that the film created a false impression that the film was about plaintiff Rogers or that she sponsored, endorsed or was somehow involved in the film. The alleged false impression created stemmed from the film's title. The Court of Appeals analyzed the competing interests at stake and arrived at a balancing test.

**10.** 15 U.S.C. § 1114(1). The section prevents the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services ... which is likely to cause confusion, or to cause mistake, or to deceive."

**11.** 15 U.S.C. § 1125(a). The section prohibits the use of "a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same...."

Consumers of artistic works ... have a dual interest: They have an interest in not being misled and they also have an interest in enjoying the results of the author's freedom of expression. For all these reasons, the expressive element of titles requires more protection than the labeling of ordinary commercial products.

\* \* \* \* \* \*

We believe that in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.

*Id.* at 998–99. There is no reason for this Court to depart from the Second Circuit's reasoning and explicit balancing test articulated in *Rogers*.

■ Plaintiffs' claims include, but also extend beyond, the titles of the children's books at issue. The common title of Defendants' series, "Pee Wee Scouts," is arguably the element most likely to create confusion among consumers. Plaintiffs contend that the impression created by the title, as well as other impressions given on a consumer's first look at the book,—from an inset with a neckerchief drawing, a cutout Pee Wee Scout badge on the back cover, and the individual titles, many of which deal with "scouting"-type activities—together are likely to cause confusion. Moreover, it seems that Defendants' choice of subject-matter, a youth organization composed of "scouts" who engage in many "scouting" activities, also forms part of Plaintiffs' trademark infringement claims. Clearly, the Lanham Act cannot restrict the Defendants' rights to author and publish books on a particular organization resembling those founded by Plaintiffs. Because such an end obviously would conflict with basic First Amendment principles, the Act cannot be read in such a manner. As a general rule, one may write fiction about virtually *any* topic, involving *any* public or private organization, corporation, or person so long as it is not defamatory.

A statement in a California Supreme Court case applies equally to people and to organizations. "[P]rominence invites creative comment. Surely, the range of free expression would be meaningfully reduced if prominent persons in the present and recent past were forbidden topics for the imaginations of authors of fiction." *Guglielmi v. Spelling–Goldberg Productions,* 25 Cal.3d 860, 160 Cal.Rptr. 352, 358, 603 P.2d 454, 460 (1979) (Bird, C.J., concurring). A leading New York case has expressed the same view.

> It is at once apparent, when we deal with the content of a book or motion picture, that we deal with no ordinary subject of commerce.... [T]heir importance 'as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform;' ... [books and motion pictures] are a constitutionally protected form of expression notwithstanding that 'their production, distribution and exhibition is a large-scale business conducted for private profit.'

*University of Notre Dame du Lac v. Twentieth Century–Fox Film Corp.,* 22 A.D.2d 452, 457, 256 N.Y.S.2d 301 (1st Dep't), *aff'd,* 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965) (quoting *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 501, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1952); *Abood v. Detroit Bd. of Educ.,* 431 U.S. at 231, 97 S.Ct. at 1797).

Lanham Act conflicts arise when the fiction is marketed commercially in a manner exploiting another's trademark in a manner likely to confuse consumers. The *Rogers* opinion states that "[p]oetic license is not without limits. The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product." *Rogers,* 875 F.2d at 997. Insofar as Plaintiffs' claim relates to the title of Defendants' books, this case resembles *Rogers;* insofar as Plaintiffs contend that the impression given by Defendants' books as a whole is misleading (that they "look" like they might have been sponsored by Plaintiffs' organizations), this case resembles the Second Circuit's *Cliffs Notes* decision which extended *Rogers*.

In *Cliffs Notes*, the Second Circuit extended its test balancing First Amendment interests and trademark infringement claims to the parody context. By definition, parody requires resemblance to the original near enough so that the public will recognize the parodist's artistic object. However, the language used by the Second Circuit is broad; clearly, the Court views parody as a subset of "artistic expression, a category that includes parody." *Cliffs Notes*, 886 F.2d at 495. The Court of Appeals' holding should not be limited in light of the express language including artistic expression in general.

> We believe that the overall balancing approach of *Rogers* and its emphasis on construing the Lanham Act 'narrowly' when First Amendment values are involved are both relevant in this case. That is to say, in deciding the reach of the Lanham Act in any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion.

*Id.* at 494.

■ Defendants have published works of fiction entitled to First Amendment protection as such. In contrast to *Rogers*, which involved social and personal commentary, and to *Cliffs Notes*, which involved parody, Plaintiffs' claim involves fictional children's books. However, the central issue in all three cases is the same: whether the risk of confusion as to the source of Defen-

dants' merchandise is greater than the public interest in artistic expression.[12] This Court is unpersuaded that Defendants' fictional children's books merit less First Amendment protection than social or personal commentary or parody. While the analysis and outcome could differ because of the nature of the different modes of artistic expression, the balancing test employed in trademark infringement cases involving the First Amendment is the same.[13] In applying the test to a new medium, this Court will analyze the public confusion element in this new context, but the Court need not directly assign a lesser First Amendment value to children's fiction as against parody or social commentary.[14] The fact that *Rogers* involved the issue of the film's title and that *Cliffs Notes* involved the parodying of the plaintiffs' study guide covers does not preclude extending the reasoning of those cases to the slightly different context now before this Court.

### C. *Application of Polaroid Factors in light of First Amendment*

■ As noted in *Cliffs Notes*, the approach adopted by the Second Circuit in *Rogers* "takes into account the ultimate test in trademark law, namely, the likelihood of confusion ' "as to the source of the goods in question." ' " *Cliffs Notes*, 886 F.2d at 495 (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 115 (2d Cir.1984) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44,

**12.** The Court notes that an author certainly would have a First Amendment right to write about the *subject* of the Boy Scouts and/or Girl Scouts. However, this right is diluted by trademark law insofar as that author cannot present her subject in a manner that confuses or misleads the public into believing, through the use of one or more trademarks, that those organizations have produced or sponsored the work in question. "[T]rademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression." *Silverman v. CBS, Inc.*, 870 F.2d 40, 49 (2d Cir.), *cert. denied* 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989).

**13.** As Judge Patterson notes in his opinion, *Girl Scouts*, 1989 WL 122769 at *5 n. 10, 1989 U.S.Dist.LEXIS 12054 at *13 n. 10, children's

fiction involving subject matter protected by trademark and the allegedly confusing presentation of that subject matter may be more likely to confuse the public, thus overcoming First Amendment concerns, than parody and social commentary in which the referral back to the original is necessary, sometimes absurd, moving or humorous, and obviously done to invite comparison between the original and the alleged infringing elements, and all for primarily artistic purposes.

**14.** In this minor respect, this Court's approach may differ slightly from the approach Judge Patterson suggested that he would use if called upon to decide this issue. *See Girl Scouts*, 1989 WL 122769 at *5 n. 12, 1989 U.S.Dist.LEXIS 12054 at *17 n. 12.

47 (2d Cir.1978) (per curiam) (citations omitted), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979))). However, in neither *Cliffs Notes* nor *Rogers* did the Second Circuit explicitly employ the *Polaroid* factors in weighing the trademark rights of the plaintiffs against the First Amendment implications of artistic expression. In response to the plaintiffs' contention that the *Polaroid* factors supply the relevant standard, the court in *Cliffs Notes* stated that

> [t]he *Polaroid* test has its origin in cases of purely commercial exploitation, which do not raise First Amendment concerns. Thus, the *Polaroid* test is at best awkward in the context of parody, which must evoke the original and constitutes artistic expression. In such a situation, the *Polaroid* factors should be applied with proper weight given to First Amendment considerations, something the district court did not do here.

*Cliffs Notes,* 886 F.2d at 495 n. 3.[15]

■ As in the *Cliffs Notes* case, pure commercial speech, speech "related solely to the economic interests of the speaker and its audience," *Central Hudson Gas & Elec. v. Public Serv. Comm'n,* 447 U.S. 530, 561, 100 S.Ct. 2326, 2349, 65 L.Ed.2d 319 (1980), is not at issue in this case, and thus the *Polaroid* test must be followed with "proper weight" given to First Amendment concerns.[16] Although possibly not required to so do in light of *Cliffs Notes* and *Rogers,* this Court chooses to examine each of the eight *Polaroid* factors in turn as the means by which to most effectively address the likelihood of confusion issue.

In any trademark infringement case, the *Polaroid* factors are not exhaustive, nor is any particular factor or factors dispositive. This Court will examine the relevant *Polaroid* factors to ascertain whether confusion exists, bearing in mind, however, First Amendment considerations so as to give due weight to the fact that the goods at issue are artistic expression, even if some degree of consumer confusion exists. *See Rogers,* 875 F.2d at 1001. This Court concludes that the likelihood of confusion is at best minimal and, in any event, not significant enough to overcome the First Amendment concerns implicated here.

### 1. *Strength of Plaintiffs' Marks*

The Second Circuit has defined the "strength" of the trademark as "its tendency to identify the goods sold under the mark as emanating from a particular ... source.... [T]he strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *McGregor–Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979); *see also Western Publishing Corp. v. Rose Art Industries, Inc.,* 910 F.2d 57, 61 (2d Cir.1990); *Banff, Ltd. v. Federated Dept. Stores, Inc.,* 841 F.2d 486, 491 (2d Cir.1988). In order to better evaluate the strength of trademarks, the Second

---

**15.** The district court in the *Cliffs Notes* case had analyzed the plaintiff's trademark claims under *Polaroid's* eight-factor balancing test, rejecting the defendant's general theory that the First Amendment gave it unbridled freedom to use a registered trademark as a parody or satire. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.,* 718 F.Supp. 1159, 1162 (S.D.N.Y.1989).

**16.** One commentator favors looking beyond the medium of expression—newspapers, books, movies, T-shirts, etc.—to determine whether speech is purely commercial and thus entitled to diminished protection. He argues that the nature of the speaker, the audience, and the expression itself should be considerations in weighing an expression's commercial nature. Kravitz, 69 B.U.L.Rev. at 159. Such an approach could have changed the result in the case of *San Francisco Arts & Athletics, Inc. v. United States Olympic Committee ("Gay Olympics"),* 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), where the Supreme Court held that protection of the Olympic trademark outweighed the resulting restrictions on the defendants' freedom of expression. The Supreme Court's analysis seemed to focus upon the Gay Olympics' appropriation of the congressionally protected word "olympic" in a similar expressive context: an athletic contest.

The present case involves a trademark's alleged use in a distinct context and in a traditionally protected First Amendment area, fictional books. As Plaintiffs emphasize, Defendants' books are sold for a profit; however, by their nature, books have a creative component and they have always unquestionably been given First Amendment protection.

Circuit utilizes the following hierarchy of trademark strength (in ascending order): (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

 A generic term is not entitled to trademark protection no matter how closely it is associated with the product of a single proprietor. A generic term refers to "the genus of which the particular product is a species" and is not inherently distinctive. *Id.* at 9. A descriptive term "conveys an immediate idea of the ingredients, qualities or characteristics of the goods," *id.* at 11; it is eligible for trademark protection only if it has "become distinctive of the applicant's goods in commerce," or, in other words, if it has acquired secondary meaning. 15 U.S.C. § 1052(f) (1988). The boundaries between the suggestive and the arbitrary or fanciful categories are not fixed, but, in both cases, the marks are entitled to registration without proof of secondary meaning. *McGregor–Doniger,* 599 F.2d at 1131. A term is suggestive "if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Abercrombie & Fitch,* 537 F.2d at 11. However, "[a] coined term, initially suggestive or even fanciful, can lose its full trademark status if it comes to signify to the public the generic name of an article rather than the source of a particular brand of that article." *Id.*

For purposes of this motion, this Court accepts that Plaintiffs' organizations are the only existing organizations called "scouts," whose members are addressed as "scout," and whose youth activities are known as "scouting." (Pl.Mem. at 20.) However, the Plaintiffs' have failed to show that the their marks are entitled to protection in the area of children's fiction. Defendants use the term "Pee Wee Scouts" rather than "Boy Scouts" or "Girl Scouts." Certainly the term "scout" alone

is neither "suggestive" nor "arbitrary or fanciful," but it may be "descriptive," as opposed to "generic," in which case Plaintiffs must demonstrate secondary meaning in the term "scout" alone.[17] This Court is of the view that the "vigorous evidentiary requirements" Plaintiffs must meet in order to prove secondary meaning cannot be met by them in the context of children's fiction. *Thompson Medical Co. v. Pfizer, Inc.,* 753 F.2d 208, 217 (2d Cir.1985); *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1040–41 (2d Cir.1992).

 The Second Circuit has articulated a number of indicators of secondary meaning: the "crucial question" is "whether the public is moved in any degree to buy an article because of its source;" *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980); a mark acquires secondary meaning when "it is shown that the *primary* significance of the term in the minds of the public is not the product but the producer;" *Centaur Communications, Ltd. v. A/S/M Communications Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987); a mark merits protection only if "consumers have come to associate [it] with a particular manufacturer or source." *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950, 953 (2d Cir.1980). While Plaintiffs have demonstrated both Congress' and the public's longstanding recognition of their organizations and of various well-known indicia of their organizations (such as uniforms, scout manuals, troops, earning merit badges, doing good deeds, etc.), they are not automatically entitled to enjoin Defendants' children's books based on these facts.

The terms "scout" and "scouting" have not acquired secondary meaning in the context of children's books. Plaintiffs have never produced significant quantities of children's fictional books using the marks

17. For purposes of this motion, the Court assumes "scout" to be descriptive. However, there is merit in Defendants' assertion that the term should be deemed generic under the Lanham Act generally. Whether "scout" has ac-

quired secondary meaning in the context of youth organizations seems a circular analysis in light of the unique protection afforded by Congress to Plaintiffs. *See infra* Note 18.

"scout" or "scouting." Furthermore, Plaintiffs have not produced evidence indicating that consumers would conclude that a children's book with "scouts" in the title and whose content deals with "scouting" is associated with their organizations.[18] Indeed, the fame of the Girls Scouts and Boy Scouts is such that confusion with the name "Pee Wee Scouts" in this context is highly unlikely. *See B.V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 729 (Fed.Cir.1988) ("The better known [a mark] is, the more readily the public becomes aware of even a small difference").

### 2. *Similarity between the Marks*

The "pertinent inquiry" for this *Polaroid* factor is "the general impression conveyed to the purchasing public by the respective marks." *Centaur Communications*, 830 F.2d at 1225. In essence, "[w]hether the similarity is likely to create confusion" is the "crucial question." *Hasbro*, 858 F.2d at 77.

In considering this factor, the Court notes that, rather than comparing two books or other objects to determine if a defendant has produced something likely to be confused with a plaintiff's object, this Court can only examine whether Defendants' books are likely to be misconstrued, because of the title, appearance, or subject matter, as products of Plaintiffs. In other words, to date Plaintiffs have not produced a similar series of children's fictional books,[19] in contrast to such cases as *Cliffs Notes* and *Merriam–Webster, Inc. v. Random House, Inc.*, 1991 WL 50951, 18 U.S.P.Q.2d 1755 (S.D.N.Y.1991), in which the courts compared plaintiffs' and defendants' existing books. The Pee Wee Scouts are a fictional entity with a name different from those of Plaintiffs' organizations. As discussed *supra*, Plaintiffs' trademark right to the words "scout" or "scouting" alone is not absolute. Plaintiffs' mark may not be dissected to prove similarity to or public confusion with Defendants' books. *See Universal City Studios*, 746 F.2d at 117 ("Donkey Kong" and "King Kong" are not similar when compared in entirety); *Inc. Publishing Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 379 (S.D.N.Y. 1985), *aff'd mem.*, 788 F.2d 3 (2d Cir.1986) (Inc. and Manhattan Inc. magazines must be compared in their entirety).

The marks of each party should be compared, with consideration given to the contexts in which the public is exposed to them. The "Pee Wee Scouts" are a fictional group introduced on the covers of Defendants' children's books. One could reasonably speculate that the average person, if asked who the "Pee Wee Scouts" are without context, might conclude that such a group is an affiliate of Plaintiffs' organizations. This situation is not before this Court. A consumer could pick up one of Defendants' books and would see no indication that the Girl Scouts or Boy Scouts were in any way connected to the book; this Court concludes that there is little similarity between Defendants' books and Plaintiffs' organizations. The books' covers (as well as the content) give no indication that they are sponsored or related to the famed Girl Scouts and Boy Scouts. Instead, Defendants have prominently placed the publisher's house mark, "Dell Young Yearling," in large letters, and a picture of

---

**18.** This Court is inclined to agree with Defendants' contention that "scouts" is a generic term in the context of children's fiction about scouting organizations. It would be difficult to write about a children's youth organization engaged in activities like sports, crafts, and helping others, and to attain the reading audience's near-universal recognition of the book's subject, without using the term "scout." The content of Defendants books may well require that they use the term "scout" to convey that content; on the other hand, Defendants' deliberately have chosen a title distinguishing their fictional organization from Plaintiffs.

**19.** Subsequent to filing this action, Plaintiffs announced their intention to produce and market a series of children's fiction. This development does not affect the outcome of the analysis of this prong of the *Polaroid* inquiry. If Defendants' behavior at the commencement of the suit was not a trademark infringement, subsequent acts by Plaintiffs to manufacture a product similar to that of Defendants will not create automatically retroactive infringement barring Defendants' products.

their logo, a colored yearling horse, above all other information on the cover. "[T]he Second Circuit has held that the defendant's use of its own well-known mark would ensure that the goods at issue would be associated with the defendant and not the plaintiff." *Pristine Industries Inc. v. Hallmark Cards Inc.*, 753 F.Supp. 140, 145–46 (S.D.N.Y.1990) (citing *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208 (2d Cir.1985) and *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960 (2d Cir.1981)); *see also, Merriam–Webster*, 18 U.S.P.Q.2d 1755, 1759 (use of "house mark—its name together with the drawing of a house" on dictionary cover "is clearly a relevant consideration in determining ... likelihood of confusion."). Dell Young Yearling denotes a division of Dell Publishing, a division of Bantam Doubleday Dell Publishing Group, Inc.; Dell Publishing and Dell Young Yearling are prominent in the publishing industry, thereby diminishing the likelihood that a consumer would confuse Defendants' books with Plaintiffs' organizations.

Plaintiffs contend that a comic strip featured since 1953 in the Boy Scouts' widely circulated magazine *Boys Life* is another factor, along with the use of "scouts," likely to confuse consumers. The comic strip is entitled "Pee Wee Harris," and it relates the adventures of a fictional Boy Scout named Pee Wee Harris. The Court disagrees that Defendants' use of the descriptive term "pee wee" is dispositive. As discussed *supra*, this Court will not dissect titles in order to find an infringement of the registered marks.[20] There is no striking similarity between a comic strip dealing with a Boy Scout and entitled "Pee Wee Harris" and books entitled "Pee Wee Scouts."

Plaintiffs claim that Defendants' use in their books of various regalia and indicia associated with Plaintiffs' organizations—and which they claim are protected by Acts of Congress, *see* 36 U.S.C. §§ 27 & 36—contributes to confusion as to the books' association with Plaintiffs. Plaintiffs' trademarks do not permit them to restrict Defendants' First Amendment right to write about and depict any subject related to Plaintiffs, including kerchiefs, merit badges, pledges and songs, troops, and other indicia related to youth organizations. The Acts of Congress referred to give Plaintiffs exclusive rights to have and use "all emblems and badges, descriptive or designating marks, and words or phrases...." 36 U.S.C. §§ 27 & 36. Defendants do not violate this statute in writing about a fictional youth organization which uses indicia and regalia common to scouting organizations. Defendants have not appropriated any of Plaintiffs' particular "emblems and badges," "descriptive or designating marks" or "words or phrases."[21] On the cover of the Pee Wee Scouts books there appears an inset of a colored neckerchief with a pin visibly reading "Pee Wee Scouts." This picture does not in any way refer to Plaintiffs' organizations, nor is it confusingly similar to anything, particularly books, that Plaintiffs have produced.

The Court concludes that the similarity of Plaintiffs' trademarks to Defendants' books is negligible and that this *Polaroid* factor weighs in Defendants' favor.

3. *Competitive Proximity of the Products*

There is no product of Plaintiffs that is directly analogous to Defendants' children's books. Plaintiffs' diverse activities have involved them in children's publi-

---

**20.** Plaintiffs claim they have a registration for the comic strip "Pee Wee Harris," (*see* Pl.Mem. at 10 n. 3) although they do not apparently bring this action against Defendants on the basis of that trademark. (*See* Compl. at ¶¶ 10–11, 13.) Thus, this Court can consider only whether the existence of the strip contributes to confusion engendered by alleged infringements of Plaintiffs' registrations for Girl Scouts, Boy Scouts, etc., but the Court does not consider infringement of the mark Pee Wee Harris itself.

**21.** Many of the features of Defendants' fictional Pee Wee Scouts differ substantially enough that consumers would be likely to recognize these differences from the well-known Boy Scouts and Girl Scouts and therefore to disassociate Defendants' books from Plaintiffs. For example, the Pee Wee Scouts are co-ed and they wear only a pinned neckerchief with street clothes in contrast to a full formal uniform of the sort the Boy Scouts and Girl Scouts wear.

cations, but relatively few have been children's fictional books using their trademarks.[22] It has never been the central purpose of Plaintiffs' organizations to publish children's fiction.[23] Of course, Plaintiffs are entitled to protect their trademarks at any time. The number or nature of past infringements is not directly relevant to this action. *Cuban Cigar Brands N.V. v. Upmann Intern., Inc.,* 457 F.Supp. 1090, 1097 n. 28 (S.D.N.Y.1978), *aff'd without op.,* 607 F.2d 995 (2d Cir.1979); *Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 126–27 (S.D.N.Y.1989); *Council of Better Business Bureaus, Inc. v. Better Business Bureau, Inc.,* 1978 WL 21729, 200 U.S.P.Q. 282, 294–95 (S.D.Fla.1978). However, the volume of children's literature incorporating "scouting" themes in content or title underscores the fact that Plaintiffs have been prominent in American life for most of this century and thus a frequent subject for fictional works.

■ For purposes of analysis of this prong of the *Polaroid* test, the Court does not examine whether a consumer *might* mistakenly believe that Plaintiffs produced or sponsored Defendants' books, when in fact Plaintiffs' actual market presence in this field has been negligible. Numerous cases in this circuit demonstrate that the competitive proximity must be close in order to support likelihood of confusion in favor of the senior user. *See e.g., Western*

*Publishing,* 910 F.2d at 62 ("it is undisputed that [publisher of children's book series] does not currently market a product directly competitive with [children's drawing slate];" therefore this factor weighs in defendant's favor); *Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1008 (2d Cir.1983) ("The differences in modes of marketing and the segregation of [plaintiff's] merchandise renders the slight proximity of the parties' products insignificant."); *Vitarroz Corp. v. Borden, Inc.,* 644 F.2d 960, 967 (2d Cir.1981) (tortilla chips and crackers not proximate).

The channels of trade utilized by Plaintiffs and Defendants are not at all wholly coterminous. Plaintiffs' market presence is as dispersed as Plaintiffs' organizations themselves, but publication and distribution of children's fiction has never been a focus of the organizations. Scouting manuals, fiction features in Plaintiffs' magazines, and catalogs, which include fictional book offerings, many of which are not published by Plaintiffs, do not compete in any direct sense with Defendants' children's fiction sold in retail stores. Much of Plaintiffs' discussion of this prong centers around the significant presence of their scouting-related products, primarily such items as uniforms, equipment, and scouting manuals, with little emphasis on children's fiction, in retail stores. (*See* Pl. Pretrial Mem. at 35–36.)

**22.** Plaintiffs and Defendants have submitted large exhibits composed of fictional works dealing with scouting. Defendants' Composite Exhibit 5 presents 54 examples of publications and films purportedly not sanctioned (i.e. not containing a copyright notice or other clear indicia of sponsorship) by the Plaintiffs whose title or content is centered on "scouts" or "scouting." Defendants have submitted examples of children's fiction sponsored by them. *See, e.g.,* Exhibits 6–8 & 14–17. It is interesting to note that in the two collector's guides to scouting books presented by Defendants (Exhibits 6 & 7), the compilers of the collector's guides note that many works, even from a time years ago when the Plaintiffs more frequently sponsored fictional works, were not sanctioned by Plaintiffs. *See* Exhibit 7 (*Girl Scout Collector's Guide*) at 187 ("Some of the [fictional] books were approved and sold by the Girl Scout organization, but most were not."); Exhibit 6 (*Collecting Scouting*

*Literature*) (documenting that only a fraction of the hundreds of fictional works dealing with Boy Scouts in some manner were copyrighted or sanctioned by Boy Scouts of America). This information simply demonstrates that Plaintiffs have not attempted to control children's fiction about their organization; they have no greater right to control fiction about a fictional scouting organization, absent egregious trademark infringement.

**23.** The provision outlining the Girl Scouts' purposes specifies that those purposes "shall be nonsectarian, nonpolitical, and not for pecuniary profit." 36 U.S.C. § 33 (1988). The Act of Congress pertaining to the Boy Scouts contains a similar limit on the Boy Scouts: "its object and purposes [are] solely of a benevolent character and not for pecuniary profit to its members." 36 U.S.C. § 24 (1988).

Plaintiffs' successful real-life maintenance of nationwide scouting organizations is not comparable to Defendants' books depicting a fictional organization with similar features, and does not demonstrate product proximity. Thus, the product proximity comparison is between Plaintiffs' organizations and Defendants' children's books rather than the fictional Pee Wee Scouts' features. *See Ocean Bio–Chem, Inc. v. Turner Network Television, Inc.,* 741 F.Supp. 1546, 1557 (S.D.Fla.1990) (real trade name not infringed by film about a company with a similar, but fictional name; product proximity requires comparison between plaintiff's goods and film itself not fictional company's goods).

This Court finds no basis to conclude that Plaintiffs' organizations' competitive proximity with Defendants' books is substantial. The facts of this case show that publishing and marketing children's fiction has been a sporadic and marginal aspect of Plaintiffs' purposes.

### 4. *Bridging the Gap*

The fourth *Polaroid* factor considers "[t]he likelihood that the senior user of the mark will bridge the gap by entering the market in which the junior user operates." *Hasbro,* 858 F.2d at 78. Plaintiffs are not publishers in any traditional sense, nor is publishing children's books likely ever to be their main service. However, the nature of the Girl Scouts and Boy Scouts has enabled Plaintiffs to enter diverse retail fields in order to further the purposes of their organizations, including publishing and distribution of publications. Plaintiffs have submitted evidence that they in fact have concluded an agreement with the Putnam and Gosset Group and that they intend to publish a series of fictional children's books which they expect to be marketed through retail bookstores beginning in approximately fall 1993. (*See* Becker Aff. ¶¶ 2–5.) Therefore, credible evidence exists that by virtue of the strength and popularity of

their organizations, Plaintiffs could at any time enter the field of children's books and that they intend to do so in the near future.[24]

Because First Amendment considerations figure strongly in this case, however, the weight of this factor must be minimal. Plaintiffs cannot limit publishers of children's fiction, even those whose books depict similar youth organizations.

### 5. *Actual Confusion*

A determination of actual confusion is one of the several *Polaroid* factors to be used in assessing likelihood of confusion. It may be proper for a court to infer from the absence of proof of actual confusion that there is no likelihood of confusion. *McGregor–Doniger,* 599 F.2d at 1136. However, the Second Circuit has noted "the difficulty of establishing confusion on the part of retail customers." *Id.* (citing *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 48 (2d Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). In order to demonstrate actual consumer confusion, parties have typically undertaken "some form of survey of consumer attitudes under actual market conditions." *Mattel, Inc. v. Azrak–Hamway Int'l, Inc.,* 724 F.2d 357, 361 (2d Cir.1983).

In this case, Plaintiffs have submitted no evidence indicating that they have ever received confused consumer-initiated inquiries or comments as to the source of Defendants' Pee Wee Scouts books. In her Declaration, defendant Judy Delton stated that she had received hundreds of fan letters from children and adults, none of which suggested that her Pee Wee Scouts were actually Girl Scouts or Boy Scouts, nor that those organizations sponsored or were "behind" the books, nor did any of them exhibit confusion between the Boy Scouts or Girl Scouts and her imaginary Pee Wee

---

**24.** Of course, Plaintiffs' decision to publish a series of similar books after commencement of their suit does not affect the rights of the parties; they must be considered as of the time the

suit was commenced. *Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.,* 1989 WL 55965, at *4–*5, 1989 U.S.Dist.LEXIS 5862, at *14–*15 (N.D.N.Y.1989).

Scouts.[25] (Delton Dec. at ¶ 9.) Defendants' books have been on the market for over three years and hundreds of thousands of copies have been distributed nationwide. Therefore, this failure to uncover even a single case of actual confusion is significant.

Due to the lack of unsolicited comments, Plaintiffs must rely upon a consumer survey to demonstrate actual confusion. The survey undertaken by the Plaintiffs indicated consumer confusion in the case of approximately 12.6% of the 598 respondents.[26] This Court is not convinced that this fraction is large enough to demonstrate significant "actual" confusion, particularly in light of the Second Circuit's discussion in *Rogers v. Grimaldi.* In its discussion of balancing the Lanham Act with the First Amendment in the context of titles of artistic works in *Rogers*, the Court stated that titles "that are explicitly misleading as to source or content, or that have no artistic relevance at all" are vulnerable to claims of deception, in contrast to "titles with at least minimal artistic relevance that are ambiguous or only implicitly misleading" that would be insulated from restriction under the Lanham Act. *Rogers*, 875 F.2d at 1000. This Court views the survey evidence submitted here as the Second Circuit did in *Rogers*.

> The survey evidence, even if its validity is assumed, indicates at most that some members of the public would draw the incorrect inference that Rogers had some involvement with the film. But that risk of misunderstanding, not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act.

*Id.* at 1001.

### 6. *Good Faith*

Several decisions have minimized the weight to be given this *Polaroid* factor. "[I]ntent is largely irrelevant in determining if consumers likely will be confused as to source. The history of advertising suggests that consumer reactions usually are unrelated to manufacturer intentions." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir. 1986); *TNT Ltd. v. TNT Messenger Service, Inc.,* 724 F.Supp. 201, 206 (S.D.N.Y. 1989).

Because Defendants could reasonably have concluded, as this Court concludes,

**25.** Plaintiffs cite the Tenth Circuit's certainly valid observation that "purchasers are unlikely to bother to inform the trademark owner when they are confused about an inexpensive product." *Beer Nuts, Inc. v. Clover Club Foods Co.,* 805 F.2d 920 (10th Cir.1986). While this may be very accurate as to purchasers of snack foods at issue in that case, it does not necessarily apply to the adults and children who are moved to comment on a series of books. In fact, the author has received letters commenting on them whereas Plaintiffs evidently have not.

**26.** Plaintiffs' original study was contested by Defendants in the previous summary judgment proceeding before Judge Patterson. Plaintiffs withdrew the results of that study and conducted a new study whose only material difference is in the composition of the universe. The original study contained only women; the new study includes men in the universe of qualified respondents.

Plaintiffs maintain that their latest study, the "Weilbacher Study," conforms to the recognized principles of market research appropriate in federal litigation. *See Handbook of Recommended Procedures in the Trial of Protracted Cases,* 25 F.R.D. 351 (1960). For purposes of this motion, the Court will assume that Plaintiffs' survey is proper as to universe and the questions asked of respondents. The Weilbacher Study polled males and females between the ages of 22 and 55 who had purchased a book for children under the age of twelve within the past six months. The interviews took place in four shopping malls in Indianapolis, Memphis, Philadelphia and San Diego. The qualified respondents were asked to examine four of Defendants' books. They were then asked in an allegedly non-leading and generally accepted manner whether they believed "that these children's books are sponsored or approved by any particular organization, or not?" Those answering "yes" were asked what organization they believed had sponsored or approved of the books and why they believed that. In "coding" the respondents answers, Mr. Weilbacher deleted answers mentioning only "scouts" or "scouting," as opposed to the full names of one of Plaintiffs' organizations. He concluded, based upon responses to the two questions described *supra,* that 12.6% were clearly confused as to content or source of Defendants' books. Plaintiffs point out that up to 37% of the respondents exhibited some confusion because they made a "general mention of scouting" in their responses.

that Plaintiffs did not possess the exclusive right to the words "scout" and "scouting," thereby limiting the rights of others to publish books about a fictional "scouting" organization, this Court cannot conclude that the Defendants acted in bad faith. Moreover, there is no evidence that Defendants deliberately sought to cause confusion between their books and Plaintiffs' organizations, for example by designing a cover maximizing "Pee Wee Scouts" and minimizing Defendants' names and logo; in fact, as discussed *supra,* Defendants have not directly referred to Plaintiffs' organizations in any way. The fact that Defendants decided to publish a series of books about a scouting organization and to use the word "scouts" in the title as part of a description of the books' content does not establish bad faith. Nor is knowledge of Plaintiffs' marks and marketing success dispositive. *See U.S. Shoe Corp. v. Brown Group, Inc.,* 740 F.Supp. 196, 199 n. 3 (S.D.N.Y.), *aff'd without op.,* 923 F.2d 844 (2d Cir.1990).

Undoubtedly, Defendants publish books to make money, and various personnel at Dell Publishing believed that a series of books for very young readers about a scouting organization in particular would sell very well. None of the numerous facts Plaintiffs have elicited from Defendants, both prior to and during discovery, that Defendants acted with knowledge of Plaintiffs' organizations and their trademark rights, undermines Defendants' good faith. As this Court has emphasized throughout this Opinion, Plaintiffs do not have the exclusive right to generate fiction about the organizations they founded. The Boy Scouts and Girl Scouts are indeed well known and dear to generations of American youth, but this fact does not prohibit Defendants from capitalizing on Plaintiffs' mystique, so long as Defendants' effort does not unduly confuse the public as to the source. *See American Footwear Corp. v. General Footwear Co.,* 609 F.2d at 662; *Merriam–Webster,* 18 U.S.P.Q.2d at 1760.

### 7. *Quality of Goods*

This Court must again confront the fact that Plaintiffs do not produce any "goods" that are closely analogous to Defendants' books. Thus, the Court examines the general quality of Defendants' books for indications that their quality may bear in some respect upon consumer confusion as to source. Several courts have noted that this *Polaroid* factor may cut either way. "[T]he factor of the quality of the defendant's product has come to represent two problems: that of the inferior product thought, through confusion, to be the superior, so that sales of the latter suffer; and that of products of equal quality, in which case there may be more likelihood of confusion." *Merriam–Webster,* 18 U.S.P.Q. at 1760 (citing *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 78 (2d Cir.1988)).

In this case, Plaintiffs allege that, because of the apparent high quality of Defendants' books,—glossy covers, attractive art work—the likelihood of confusion is increased and that Defendants are likely to profit from Plaintiffs' good will. *See Banff,* 841 F.2d at 492; *Lois Sportswear,* 799 F.2d at 875. Defendants' do not use Plaintiffs' names or other marks in a misleading way. Moreover, to date Plaintiffs have not published similar children's serial fiction likely to be confused with Defendants' products. As discussed *supra,* the minimal evidence of actual or possible confusion, in combination with the First Amendment considerations presented here, limits the effectiveness of Plaintiffs' argument that Defendants are unlawfully profiting from Plaintiffs' good will.

### 8. *Buyers' Sophistication*

This final *Polaroid* factor is derived from "the belief that unsophisticated consumers aggravate the likelihood of confusion." *Hasbro,* 858 F.2d at 79. The value of an article may influence the sophistication and awareness of buyers which in turn may influence the degree of confusion as to origin. At a sale price of $2.50 to $2.75, Defendants' books might be categorized as "impulse" buys. However, as the *Hasbro* court noted, confusion is most likely under this factor "when the ... products' marks are similar *and* the [products are] inexpen-

sive." *Id.* (emphasis added). Plaintiffs contend that, in combination with other confusing aspects of Defendants' product,—"scouts" in the title and the kerchief logo on the cover suggesting Plaintiffs' sponsorship—parents or others, many of whom may be "unsophisticated" because of the low price and who are buying "on impulse" due to that price, may buy Defendants' books without making an informed decision as to quality. Plaintiffs' reputation and control over their marks is thus subjected to Defendants' quality and marketing decisions. Plaintiffs do not support their contentions nor, in the view of this Court, can they do so. As in the case of purchasers of dictionaries discussed in *Merriam–Webster*, 18 U.S.P.Q.2d at 1761, purchasers of children's books are undoubtedly literate; moreover, undoubtedly they have in mind supplying quality reading material to a five or six year old. In short, they are not necessarily "unsophisticated" because the books are low priced. In this case, Plaintiffs do not market a similar product which could easily confuse hypothetical "unsophisticated" consumers. Even if this Court were to agree that the buyers of Defendants' books were unsophisticated, "the complete lack of evidence of actual confusion militates against according this factor much weight." *Western Publishing*, 910 F.2d at 63.

The sparse evidence and marginal relevance of lack of consumer sophistication certainly does not contribute to overcoming the First Amendment considerations presented by this action.

### 9. *Other Factors*

The factors listed in the *Polaroid* decision are not exhaustive; thus, a court may consider other relevant factors in determining whether the plaintiff is entitled to relief. A court may consider the conflicting interest of the parties involved. *McGregor–Doniger*, 599 F.2d at 1140. The injunctive relief sought would provide little

benefit to Plaintiffs, who have not demonstrated any tangible harm, whether monetary or to reputation, to their marks from Defendants' publications, whereas it would substantially harm Defendants to enjoin them from publishing the Pee Wee Scouts series.

\* \* \* \* \* \*

The overwhelming consideration in balancing Plaintiffs' Lanham Act trademark rights with Defendants' interests is in preserving the public's and Defendants' First Amendment interests. In considering the substantial evidence resulting from the parties' completed discovery, this Court is unable to find that there is a likelihood of confusion between Plaintiffs' protected trademarks and Defendants' children's books sufficient to overcome the First Amendment value of protecting creative works such as Defendants' books. The Court's decision rests heavily upon *Rogers v. Grimaldi*, whose principles and conclusions this Court deems clearly applicable to the context of children's fiction. Although the title and content (including the use of indicia associated by many with Plaintiffs' organizations) of Defendants' books could engender some consumer confusion as to source, no overt references to Plaintiffs' trademarks are ever made, thus further minimizing the risk and reasonableness of confusion, particularly in a creative field protected by the First Amendment. "[M]ost consumers are well aware that they cannot judge a book solely by its title any more than by its cover." *Rogers*, 875 F.2d at 1000.

### D. *Plaintiffs' State Law Claims*

#### 1. *New York Anti–Dilution Claim*

▮▮▮▮ Plaintiffs are not entitled to relief under New York State's anti-dilution law. N.Y. General Business Law, § 368–d (McKinney 1984).[27] In order to prove dilution Plaintiffs would have to prove two

---

**27.** Section 368–d provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark

registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

elements: "(1) an extremely strong mark—either because of the mark's distinctive quality or because it has acquired secondary meaning—and (2) a likelihood of dilution". *Mead Data Central, Inc. v. Toyota Motor Sales,* 875 F.2d 1026, 1032 (2d Cir. 1989) (citations omitted) (Sweet, J., concurring). Plaintiffs cannot fulfill their burden under the facts of this case.[28] The fact that both Plaintiffs' and Defendants' marks use the word "scouts" falls far short of establishing the "substantial similarity" required in the dilution context. *See Mead Data Central,* 875 F.2d at 1029; *Universal City Studios,* 746 F.2d at 120.

In this case, satisfaction of the second element—likelihood of dilution—turns on the issue of whether Defendants' mark "blurs" the senior mark's product identification. Blurring involves "the whittling away of an established trademark's selling power and value through its unauthorized use by others upon dissimilar products." *Mead Data Central,* 875 F.2d at 1028, 1031. The Court has no doubt that the fame, reputation and selling power of Plaintiffs' organizations will continue undisturbed. As in *Universal City Studios,* the Court concludes "that the names and characters in dispute are so different that no reasonable question of fact [is] raised on the issue of blurring." 746 F.2d at 120. The Court does not find any danger of dilution to Plaintiffs' marks in a series of fictional books about a fictional scouting group.

2. *Common Law Trademark and Unfair Competition Claims*

■ Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as "the state law claim may require an additional element of bad faith or intent." *Weight Watchers International, Inc. v. Stouffer Corp.,* 744 F.Supp. 1259, 1283 (S.D.N.Y. 1990). Plaintiffs would need to prove the use of their trademarks in a way likely to confuse consumers as to the source of the product just as in a Lanham Act claim.

*Educational Testing Service v. Touchstone Applied Science Assoc., Inc.,* 739 F.Supp. 847, 849 (S.D.N.Y.1990). In deciding to author and publish a series of children's fictional books about a fictional scouting organization and in choosing to use a different name and different scouting-like indicia, Defendants have not misappropriated the labors and expenditures of Plaintiffs, nor have they "copied" Plaintiffs marks, thereby establishing a presumption of bad faith. *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir. 1980); *Jolly Good Industries, Inc. v. Elegra, Inc.,* 690 F.Supp. 227, 233 (S.D.N.Y. 1988). In light of this Court's analysis of Plaintiffs' Lanham Act claims, the Court finds Plaintiffs' state law unfair competition claim to be legally insufficient and therefore not a bar to Defendants' motion for summary judgment.

\* \* \* \* \* \*

For the foregoing reasons, Defendants' motion for summary judgment is granted and the complaint is hereby dismissed.

SO ORDERED.

---

**28.** Because Plaintiffs cannot prove dilution, this Court need not decide whether the First Amendment would bar recovery even if dilution were proven. *See L.L. Bean, Inc. v. Drake Publishers, Inc.,* 811 F.2d 26 (1st Cir.), *cert. denied,* 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987).