MAHARISHI HARDY BLECHMAN
LTD., a U.K. Company,
Plaintiff,

v.

ABERCROMBIE & FITCH COMPANY,
a Delaware corporation, and Aber-
crombie & Fitch, Stores, Inc., an Ohio
corporation, Defendant.

No. 03 Civ.1028 VM.

United States District Court,
S.D. New York.

Dec. 8, 2003.

536

Philippe Bennett, Coudert Brothers, L.L.P., New York, NY, for Maharashi Hardy Blechman Ltd.

Frank J. Colucci, David M. Dahan, Kathleen M. McGann, Colucci & Umans, New York City, for Abercrombie & Fitch Co., Abercrombie & Fitch Stores, Inc.

### DECISION AND ORDER

MARRERO, District Judge.

The principal issue raised by the motion for summary judgment now before the Court is whether plaintiff, a high-end fashion designer, may recover under a theory of trade dress infringement where defendants allegedly have borrowed heavily from plaintiff's innovative line of pants. On that issue, the Court concludes that plaintiff's line of pants does not have a consistent overall look and is therefore unprotectable as a singular trade dress. The Court also addresses several related causes of action for, among other things, copyright infringement and unfair competition. As regards those causes of action, the Court concludes that plaintiff's claims fail as a matter of law. Accordingly, defendants' motion for summary judgment is granted. Because the facts of this case as described in the complaint present exceptional circumstances, the Court will stay the entry of judgment in defendants' favor to permit the plaintiff to assess whether it is able to amend its complaint to remedy the defects identified in this opinion with respect to its claims for trade dress infringement, unfair competition, and trade dress dilution, and if so, to file a motion for leave to amend its complaint.

### I. BACKGROUND [1]

As early as 1997, plaintiff Maharishi Hardy Blechman Ltd. ("Maharishi") began

---

1. The Court derives the factual summary from (1) the First Amended Complaint ("First Am.

selling a line of high-end, baggy, military-style pants that Maharishi called Snopants, which have an elaborate system of drawstrings, buttons, and other hardware components. Snopants legs can be shortened by means of interior epaulettes,[2] which fasten to buttons on the inner and outer leg seams and hold the rolled-up pant legs in place. Some Snopants also contain an embroidered fiery dragon on the back of one leg. Snopants sell for up to $500 at elite retailers such as Henri Bendel, Barneys, and Fred Segal. Several fashion publications have featured Maharishi's designs, including Snopants, and have photographed celebrities such as Madonna and Jennifer Aniston wearing Snopants.

In 1999 defendants Abercrombie & Fitch Company and Abercrombie & Fitch Stores, Inc. (collectively, "Abercrombie") began selling a style of pants called the Shi Ding Roll Up Pant ("Shi Dings") for around $75. Shi Dings are strikingly similar to at least one incarnation of Snopants. They contain a similar roll-up feature and somewhat similar embroidered dragon on the back of one leg. They also have a similar style of visible stitching and a similar pocket arrangement. In February 2000, Maharishi sent a letter to Abercrombie contending that it considered Shi Dings and other unspecified Abercrombie garments to be unlawful infringements of the Snopants trade dress. In an April 2000 letter, Abercrombie agreed to cease selling Shi Dings, though denying any infringement. The letter indicated that Abercrombie had already sold around 7,200 of its stock of 8,200 and that Abercrombie did not intend to order any more.

In February 2003, Maharishi filed the complaint in this litigation against Abercrombie alleging, among other related causes of action, that Shi Dings and other unspecified Abercrombie garments infringe upon the Snopants trade dress. Responding to the Court's request for specificity, Maharishi later identified twenty-eight (28) allegedly infringing Abercrombie garments, including various Abercrombie shorts, T-shirts, and cargo pants. The complaint's formulation of Maharishi's trade dress at issue describes nine distinctive features:

> The design of the SNOPANTS incorporates a number of elements that either alone or in combination are inherently distinctive and non-functional, including: the embroidered Asian themed embroidery on the rearside of the pant legs; the roll-up feature of the pant legs; the visible triple-stitched waist band; the narrow pocket near the right-hand pant hem; the eccentric use of elasticized cord to cinch the waist and hems; the eccentric placement of double cord locks for waist and/or hem adjustment toward the center front of the waist; the slanted and curved front pockets with contrasting pocket lining; and the double knee dart with buttons on the side seams.

First Am. Compl. ¶ 16.

After discovery,[3] Abercrombie moved for summary judgment on the grounds, among others, that the Snopants trade dress was (1) not specific enough; (2) not consistently used throughout the Snopants

---

Compl."); (2) Defendants' Statement of Material Facts on Which There is No Genuine Issue to Be Tried, dated Aug. 21, 2003; and (3) Plaintiff's Statement of Material Facts and Plaintiff's Response to Defendants' Statement of Facts, dated Oct. 2, 2003. Except where necessary, the Court will not cite these sources further.

**2.** An epaulette is "an ornamental strip or loop sewn across the shoulder of a dress or coat." *Meriam–Webster's New Collegiate Dictionary* 388 (10 ed.1999).

**3.** Abercrombie did not seek any discovery.

line; and (3) "functional" and thereby not entitled to protection.

## II. *STANDARD FOR A MOTION FOR SUMMARY JUDGMENT*

The Court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must first look to the substantive law of the action to determine which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if the parties dispute material facts, summary judgment will be granted unless the dispute is "genuine," *i.e.*, "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505.

In a case such as this one where the non-moving party would bear the burden of proof at trial, the movant first has the burden to make a *prima facie* case that it is entitled to prevail on the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant can meet this burden by either "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or "demonstrat[ing] to the Court that the nonmoving party's evidence is insufficient to establish an essential element" of the claim. *Id.* After such a showing, the non-moving party must respond with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). To this end, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998). In other words, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Throughout this inquiry, the Court must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party. *See Hanson v. McCaw Cellular Communications, Inc.*, 77 F.3d 663, 667 (2d Cir. 1996).

## III. *DISCUSSION*

### A. *TRADE DRESS INFRINGEMENT*

■ Section 43(a) of the Lanham Act permits plaintiffs to recover damages against any person who

> in connection with any goods … or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof … which … is likely to cause confusion, or to cause mistake, or to deceive … as to the origin, sponsorship, or approval of his or her goods … by another person. . . .

15 U.S.C. § 1125(a). "Section 43(a) is a broad federal unfair competition provision which protects unregistered trademarks similar to the way that section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), protects registered marks." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002). Congress intended the Lanham Act to help consumers distinguish among competing products and to protect producers against misappropriated goodwill. *See*

*Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.,* 111 F.3d 993, 999 (2d Cir.1997) (citing S.Rep. No. 79–1333, *reprinted in* 1946 U.S.C.C.A.N. 1274, 1275).

■ Although not originally classified under "trademarks," the concept of "trade dress" – the overall appearance or image of goods – has been incorporated into the general trademark law, including § 43(a). *See Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000); *Restatement (Third) of Unfair Competition* § 16 cmt. a (1995). Trade dress claims under § 43(a) traditionally referred to claims where "the manner in which a product was 'dressed up' to go to market with a label, package, display card, [or] similar packaging elements" could confuse the customer as to source of the product. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir.1995). The scope of trade dress claims has expanded to include "the totality of any elements in which a product or service is packaged or presented." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:1, at 8–2 (4th ed.2001); *see also Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (upholding trade dress claim regarding the "total image" of a restaurant chain). More recently, the scope of trade dress even includes claims, such as the one in this case, involving the design of a product itself. *See Wal–Mart,* 529 U.S. at 209, 120 S.Ct. 1339 (citing, among other cases, *Knitwaves, Inc. v. Lollytogs, Ltd.,* 71 F.3d 996 (2d Cir.1995)); McCarthy, *supra,* § 8:5.

However, courts exercise "particular 'caution,' when extending protection to product designs" because those claims present an acute risk of stifling competition. *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 380 (2d Cir. 1997) (quoting *Jeffrey Milstein,* 58 F.3d at 32). "While most trademarks only create a monopoly in a word, a phrase or a symbol, 'granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves.'" *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 115 (2d Cir.2001) (quoting *Landscape Forms,* 113 F.3d at 380) (denying trade dress protection to a particular style of costume jewelry).

■ In a trade dress action under § 43(a), the plaintiff bears the burden to prove three things: first, "that the mark is distinctive as to the source of the good," *Yurman Design,* 262 F.3d at 115; second, "that there is a likelihood of confusion between its good and the defendant's;" *id.;* and third, "that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3). The first and third requirements, distinctiveness and functionality, are at issue in this case.

■ Generally speaking, "the plaintiff may prove distinctiveness by showing *either* that the 'intrinsic nature' of the mark serves to identify a particular source (what is known as 'inherent distinctiveness') *or* that 'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself' (what is known as 'acquired distinctiveness' or 'secondary meaning')." *Yurman Design,* 262 F.3d at 101 (quoting *Wal–Mart,* 529 U.S. at 210–211, 120 S.Ct. 1339) (emphasis and alteration in original). In product design cases such as this one, however, the Supreme Court has held that the plaintiff must always make the more difficult showing of "acquired distinctiveness." *Wal–Mart,* 529 U.S. at 216, 120 S.Ct. 1339. The reason for that more rigorous requirement is that a product's design, as opposed to its packaging or labels, is almost never inherently source-identifying: "Consumers are aware of the reality that, almost invariably, even the most unusual of product designs – such as

a cocktail shaker shaped like a penguin – is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* at 213, 120 S.Ct. 1339. The broad category of distinctiveness incorporates three related doctrines which are at issue in this lawsuit: genericness, specificity, and consistency. A trade dress which is either generic, non-specific, or inconsistent among its products cannot be distinctive.

■ First, even where the plaintiff can demonstrate acquired distinctiveness, a trade dress that seeks to protect an "idea, a concept, or a generalized type of appearance" is "generic," not distinctive, and therefore not subject to trade dress protection. *See Jeffrey Milstein,* 58 F.3d at 32 (denying trade dress protection to the concept of greeting cards die cut to the shapes of the photographs depicted on the cards). Extending trade dress to generic features would "undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas." *Id.; see also Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) ("It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§ 154, 173, after which competitors are free to use the innovation."); McCarthy, *supra,* § 8:5, at 8–20 (stating that trade dress law should not "create 'back-door patents,' substituting for the strict requirements of utility patent law"). In other words, limiting trade dress to truly distinctive, source-identifying, features preserves the strong federal policy, embodied in patent and copyright, of vigorous competition. *See Landscape Forms,* 113 F.3d at 380; *see also TrafFix,* 532 U.S. at 29, 121 S.Ct. 1255 ("Allowing competitors to copy will have salutary effects in many instances."); *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 657 (7th Cir.1995) ("Copying is not only good, it is a federal right – a necessary complement to the patent system's grant of limited monopolies.").

■ Second, the plaintiff must articulate with specificity the design elements of the trade dress. *Landscape Forms,* 113 F.3d at 381. At least four problems arise when courts face imprecise trade dress definitions: (1) jurors may view the same trade dress differently; (2) jurors or courts may have trouble determining issues of functionality and secondary meaning; (3) the imprecision may indicate that the trade dress is overbroad; and (4) courts may have trouble issuing a narrowly-tailored injunction. *Yurman Design,* 262 F.3d at 117; McCarthy, *supra* § 8.3 at, 8–12.

■ Third, where, as here, the plaintiff seeks trade dress protection for an entire product line, as opposed to singular products, the plaintiff must demonstrate that the trade dress signifies an overall look which is " 'consistent' " throughout the line. *Id.* at 116 (quoting *Walt Disney Co. v. Goodtimes Home Video Corp.,* 830 F.Supp. 762, 766 (S.D.N.Y.1993)). "[F]or obvious reasons, concern for protecting competition" in the product line context "is particularly 'acute.' " *Id.* (quoting *Landscape Forms,* 113 F.3d at 380). Without these rigid requirements regarding genericness, specificity, and consistency, it would be "too easy for the question of design and configuration ('overall look') to degenerate into a question of quality, or beauty, or cachet." *Id.* at 116–17.

■ As mentioned above, a trade dress plaintiff also bears the burden to prove that the trade dress is not functional. 15 U.S.C. § 1125(a)(3). A trade dress feature is functional " 'if it is essential to the use or purpose of the article or it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Quali-*

*tex,* 514 U.S. at 166, 115 S.Ct. 1300 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)).[4] The Second Circuit has held that "the functionality doctrine may apply even to features of a product that are purely ornamental." *Knitwaves,* 71 F.3d at 1006. This is also called the "aesthetic functionality doctrine." *Id.* "Where an ornamental feature is claimed as a trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection." *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc.,* 916 F.2d 76, 81 (2d Cir.1990). Courts must rigorously apply the non-functionality requirement " 'to avoid undermining the carefully circumscribed statutory regimes for the protection of useful and ornamental designs under federal patent and copyright law.' " *Yurman Design,* 262 F.3d at 116 (quoting *Restatement (Third) of Unfair Competition* § 16 cmt. b).

 Where the asserted trade dress extends to the "overall look" of the combination of features comprising a product or product line, the Court must evaluate the distinctiveness and functionality of those features *taken together,* not in isolation. *See LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 76 (2d Cir.1985) (recognizing trade dress for "particular combination and arrangement of design elements" of a sports bag); *see also Jeffrey Milstein,* 58 F.3d at 32 ("Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry."). "Nonetheless, the fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea." *Id.*

In this case, Maharishi seeks trade dress protection for the overall look of Snopants. However, Maharishi's confusing filings have made a moving target out of both the definition of Maharishi's trade dress and the precise pants to which that trade dress pertains. Unfortunately, these muddy preliminary issues overshadow the underlying merits and, as the Court explains below, require the Court to decide the motion based upon suppositions which may not accord with what Maharishi originally intended. The thorny threshold questions are: (1) Which pants are the subject matter of Maharishi's trade dress claim?; and (2) What features of those pants comprise the trade dress?

In regard to the first question, Maharishi claims for the first time in its opposition brief to this motion that it is *only* seeking protection for the Classic Snopants.[5] Maharishi makes this assertion in

4. As explained more fully, *infra,* the definition of functionality is not as clear as the Supreme Court's statement might indicate. *See Eppendorf–Netheler–Hinz GMBH v. Ritter GMBH,* 289 F.3d 351, 355 (5th Cir.2002) ("It is clear that functional product features do not qualify for trade dress protection. However, the definition of 'functionality' Has not enjoyed such clarity.").

5. It is not clear exactly which Snopants Maharishi asserts are Classic Snopants. Abercrombie's Shi Dings are strikingly similar to

one incarnation of Snopants, and *that* particular style, at least, is among the Classic Snopants. The Court notes, however, that, based upon the Court's physical examination of those pants, there is no label or other writing indicating they are either "Snopants" or "Classic Snopants." In any event, in light of Maharishi's assertion that all Classic Snopants contain eight of the features at issue, but some lack embroidery, the Court can infer (1) that the term Classic Snopants describes more than one unique pants style; and (2) that many Maharishi pants which are part of

response Abercrombie's argument that Maharishi has not consistently applied the Snopants trade dress throughout the Snopants line. According to Maharishi, all *Classic* Snopants contain at least eight of its claimed trade dress' nine elements (some lack the embroidery). In its reply brief, Abercrombie characterizes this maneuver as a belated and disingenuous attempt to amend the complaint. The Court agrees.

■ The complaint unambiguously seeks protection for the entire "line" of full-length Snopants and defines the term "Snopants," which is used throughout the complaint, as the collective of "Snopant," "Snopants," and "Sno Camp Pantz." *See* First Am. Compl. ¶ 15.[6] In discussing the publicity surrounding the "distinctive trade dress of the SNOPANTS design," the complaint cites to two exhibits which contain numerous photos of all varieties of Maharishi pants. *Id.* ¶ 18, Exs. 1, 3. The fact that Maharishi has identified twenty-eight allegedly infringing Abercrombie products, including shorts, T-shirts, and pants (some of which hardly resemble any of the Maharishi pants depicted in the complaint), further suggests that Maharishi initially intended the lawsuit to encompass the entire Snopants line (whatever that may be), not just Classic Snopants. Finally, the Court notes that neither the complaint nor any other document previous to Maharishi's summary judgment opposition brief mentions that only the Classic Snopants are at issue. A summary judgment opposition brief is not a substitute for a timely motion to amend the complaint. *Cf. Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir.1985) (holding that a summary judgment opposition brief is not a substitute

for a Federal Rule of Civil Procedure 56(f) affidavit). The Court will therefore consider the asserted trade dress as pertaining to any Maharishi pants sold under the names "Snopant," "Snopants," or "Sno Camp Pantz," not just Classic Snopants.

In regard to the second question, Maharishi offered a formulation of the trade dress in its summary judgment opposition brief which is narrower than the complaint's formulation, and the Court must decide whether it would be procedurally proper to consider the new, narrower version. Again, Abercrombie objects to this maneuver as a belated attempt to amend the complaint. On this issue, the Court will assume, without deciding, that the narrower formulation was properly made.

In updating its trade dress definition, Maharishi responds to Abercrombie's argument that the trade dress formulation in the complaint is not specific enough. Abercrombie argues that extending trade dress protection to the nine elements either "alone in combination," as alleged in the complaint, would cover nearly one million conceivable pants styles. That argument overstates a nevertheless meritorious point. The paragraph in the complaint describing the trade dress alleges that Snopants incorporate "a number of elements that either alone or in combination are inherently distinctive and non-functional. . . ." First Am. Compl. ¶ 16. Abercrombie apparently reads that sentence to allege that *each* of the nine features is, by itself, *both* inherently distinctive and non-functional and therefore protectable as a free-standing trade dress. In other words, Abercrombie reads Maharishi's complaint to be seeking a monopoly on, for example, the use of slanted and curved pockets.

---

this record, either in the complaint's photos or in Abercrombie's submissions, are not Classic Snopants.

**6.** At oral argument, Maharishi's counsel represented that these terms merely identified the previous names for "Classic Snopants," only adding further confusion to these issues.

Such a broad trade dress would obviously be unprotectable.

■ The Court does not agree with Abercrombie's reading of the complaint and instead takes the more natural and plausible reading which alleges that each feature is *either* protectable taken alone *or* protectable in some combination with the other features. This narrower reading is still overbroad as pertains to this case, however, because neither a juror, in adjudicating the issue, nor a Court, in formulating an injunction, would know exactly which particular combination of numerous elements claimed would trigger trade dress protection. Given that high number of allegedly unique featured claimed here, the range of theoretically possible combinations would be quite extensive, inevitably inviting judicial guesswork as to which of the myriad permutations yields a sufficiently distinctive protectable product. *Cf. Yurman Design*, 262 F.3d at 117 (explaining that a specific formulation is necessary for determining material facts and for formulating injunctions).

■ Maharishi has attempted to remedy this defect by offering in its opposition brief a revised articulation which is essentially the *conjunction* of eight of the nine elements (all but the embroidery, which some Snopants lack):

1. Roll-up pant legs utilizing buttons and epaulettes; and

2. Visible triple-stitched waist band; and

3. Small, flat pocket near the right-hand pant hem; and

4. Elasticized cord to cinch the waist and hems; and

5. Use of double cord locks on the waist and hem; and

6. Placement of two double cord locks along the waist, each in a non-centered position between the fly and each side seam of the pants; and

7. Slanted and curved front pockets, with pocket lining of a contrasting color; and

8. Double knee darts located approximately halfway down the front of the pant legs and between buttons on the side seams; and

9. Sometimes Asian-themed embroidery on the rear side of the pant legs.

*See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, dated Oct. 2, 2003 ("Pl. Mem.") at 7. That formulation is very precise and would satisfy the specificity requirement.

It is unclear, however, whether a trade dress plaintiff must cling to the precise language of a trade dress as stated in a complaint, or whether a plaintiff may offer a revised formulation in another filing. There is at least some support for the proposition that a plaintiff may offer an updated formulation at a later stage in the litigation. *See Coach, Inc. v. We Care Trading Co., Inc.*, No. 99 Civ. 11672 (DLC), 2001 WL 812126, *1 n. 3 (S.D.N.Y. July 18, 2001) ("Coach had provided varying formulations of this trade dress in its pre-trial papers but offered this definition at the pre-trial conference when asked by the Court for a final statement of its trade dress.").[7] Moreover, one court in this district explained recently that a "product's trade dress is not, in a legal sense, the

---

7. *Coach* is arguably distinguishable because, in that case, the defendant did not file a motion for summary judgment to challenge the allegedly overbroad earlier formulations. *See Coach*, 2001 WL 81216, at *5 ("[Defendant] further argues that it received varying definitions of trade dress during its discovery depositions. Notably, however, [defendant] filed no motion to dismiss the Complaint or for summary judgment on this or any other ground. . . .").

combination of words which a party uses to describe or represent [its] 'total image.' Rather, the trade dress *is* that image itself, however it may be represented in or by the written word." *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, No. 01 Civ. 11295, 2003 WL 21056809, at *5 (S.D.N.Y. May 8, 2003) (emphasis in original). The overall image of Snopants was adequately conveyed by means of pictures in the complaint.

On the other hand, it is inappropriate for Maharishi to attempt to remedy a legal deficiency in the trade dress articulation *after* Abercrombie's principal summary judgment briefing, especially where, as here, it is precisely that articulation which Abercrombie asserts is overbroad. Because the Court concludes, as explained below, that Abercrombie is entitled to summary judgment on this claim on other grounds, the Court assumes, without deciding, that the narrower formulation is procedurally proper.

The Court must address one final issue with regard to the narrowed articulation of the trade dress. The ninth "element" of the asserted trade dress is: "Sometimes Asian-themed embroidery on the rear side of the pant leg." Pl. Mem. at 7. This formulation is immediately problematic because as a matter of logic, *every* conceivable pair of pants either has, or does not have, Asian-themed embroidery. In other words, the addition of the "and/or" element of "sometimes" Asian embroidery adds nothing whatsoever to the asserted trade dress. Accordingly, the Court will disregard the embroidery element in considering the asserted trade dress. *See Elements/Jill Schwartz, Inc. v. Gloriosa Co.*, No. 01 Civ. 904 (DLC), 2002 WL 1492197, at *5 n. 1 (S.D.N.Y., July 15, 2002) (disregarding elements which plaintiff asserted were "often" present).

Abercrombie argues that Maharishi has not carried its burden of demonstrating that the claimed trade dress is not functional. In support of its contention, Abercrombie submitted the declaration of one of its own designers, who explains how each of the nine elements of Maharishi's asserted trade dress improves either the pants' quality (*e.g.,* the double knee darts allow the knee to bend easier) or look (*e.g.,* the contrasting pocket lining adds color interest), or both. Maharishi counters with the declaration of a fashion professor who offers alternate designs for each of the nine elements. He states, for example, that the roll-up feature could be achieved by Velcro, instead of epaulettes, and that the pockets could be squared, instead of slanted and curved. According to Maharishi, these alternatives demonstrate that competitors would not be at a "significant non-reputation-related disadvantage," *Qualitex,* 514 U.S. at 166, 115 S.Ct. 1300, if it they were precluded from copying the Snopants trade dress. Maharishi concedes that the features may add to the aesthetic appeal of Snopants but argues that the particular *combination* of features is primarily "source identifying," not aesthetically functional.

Abercrombie responds that the issue of alternate designs is entirely irrelevant in light of the Supreme Court's decision in *TrafFix Devices v. Marketing Displays,* 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001). Abercrombie is correct that *TrafFix* bears strongly on the import of alternate designs to the question of functionality, but the exact holding of *TrafFix* on this point is highly elusive. In *TrafFix,* the plaintiff owned an expired utility patent for a dual-spring device, the "WindMaster," designed to keep outdoor road signs upright in strong winds. *Id.* at 25–26, 121 S.Ct. 1255. The defendant began selling a similar-looking dual-spring device, the "WindBuster." *Id.* On a summary judgment motion, the district court denied trade dress protection to the WindMaster

because (among other reasons) the Wind-Master was functional. *Id.* at 26, 121 S.Ct. 1255. The Sixth Circuit reversed on the ground that, because various other spring devices were available, the particular dual-spring device at issue was not a "competitive necessity": "If [defendant] or another competitor chooses to use the dual-spring design, then it will have to find *some other way* to set its sign apart to avoid infringing the WindMaster's trade dress." *Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 940 (6th Cir.1999) (emphasis in original). The Sixth Circuit emphasized that, to be deemed functional, "[e]xclusive use of a feature must 'put competitors at a *significant* non-reputation-related disadvantage' before trade dress protection is denied on functionality grounds." *Id.* (quoting *Qualitex*, 514 U.S. at 165, 115 S.Ct. 1300) (emphasis in Sixth Circuit opinion).

The Supreme Court reversed and held that the expired patent was "strong evidence" that the feature was functional. *Id.* at 29, 121 S.Ct. 1255. The Court explained that, in addition to underplaying the importance of the expired utility patent, the Sixth Circuit's "error likely was caused by its misinterpretation of trade dress principles in other respects." *Id.* at 33, 121 S.Ct. 1255. Specifically, the Sixth Circuit should not have relied on the quoted language from *Qualitex* as its definition of functionality. 532 U.S. at 32–33, 121 S.Ct. 1255.

The Supreme Court reaffirmed the "traditional" (or *Inwood* ) test, under which a trade dress is functional "when it is essential to the use or purpose of the device or when it affects the cost or quality of the device." *Id.* at 33, 121 S.Ct. 1255 (citing *Inwood Labs.*, 456 U.S. at 850 n. 10, 102 S.Ct. 2182). The language in *Qualitex*

"[e]xpand[ed] upon the meaning of this phrase" and added what is sometimes called the "competitive necessity" test: "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.' " *Id.* (quoting *Qualitex*, 514 U.S. at 165, 115 S.Ct. 1300) (alteration in original). The Supreme Court stated that the Sixth Circuit's error was to treat the *Qualitex* expansion "as a comprehensive definition." *Id.* Instead, the Court noted: "Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature." *Id.* at 33, 121 S.Ct. 1255. The Supreme Court suggested that it would be "proper to inquire into a 'significant non-reputation-related disadvantage' in cases of "[a]esthetic functionality" because aesthetic functionality was the "central question" in *Qualitex*." [8]

The Supreme Court concluded that the dual-spring design was "the reason the device works" and therefore declared that "[t]here is no need ... to engage ... in speculation about *other design possibilities*, such as using three or four springs which might serve the same purpose." *Id.* (emphasis added). Abercrombie highlights this last sentence to support the proposition that other design possibilities are irrelevant where an asserted trade dress is "functional" under the traditional definition of functionality.

Although Abercrombie's position is not without force, the Court instead agrees with the Federal Circuit's interpretation of *TrafFix*:

[T]he [Supreme] Court merely noted that once a product feature is found functional based on other considerations there is no need to consider the availability of alternative designs, because

---

8. McCarthy criticizes this "amazing" and "incomprehensible" statement because aesthetic functionality was not "not the question in any

way in *Qualitex*, let alone the 'central question.' " McCarthy, *supra*, § 7:80, at 7–198.

the feature cannot be given trade dress protection merely because there are alternative designs available. But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.

*Valu Engineering, Inc. v. Rexnord Corp.,* 278 F.3d 1268, 1276 (Fed.Cir.2002). A leading treatise agrees, and points out that, in *TrafFix,* there was "strong evidence" of functionality on the basis of the prior utility patent. McCarthy, *supra,* 7:75 at 7–180. The fact that *TrafFix* was such an easy case of functionality, based on considerations other than alternative designs, supports the narrower reading. This Court adds that the primary issue in *TrafFix* was the effect of the utility patent, and that the Supreme Court would have doubtfully rendered such a sweeping change in trade dress law without more discussion (or clarity, for that matter). *See* 532 U.S. at 29, 121 S.Ct. 1255 ("The principal question in this case is the effect of an expired patent on the claim of trade dress infringement."). Finally, the Supreme Court characterized *Qualitex* as "[e]xpanding upon the *meaning*" of the *Inwood* test, thereby suggesting that the issue of alternate designs (or, competitive necessity) is still instructive in applying the *Inwood* test. *Id.* at 32, 121 S.Ct. 1255 (emphasis added); *but cf.* Note, *Will TrafFix "Fix" the Splintered Functionality Doctrine: TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 40 Hous. L.Rev. 541, 572 (2003) ("The availability to competitors of alternative designs – as opposed to information about the cost or quality of alternative designs – has no place in the *Inwood*-utilitarian functionality standard.").

Under *TrafFix,* the Court must first ask whether the trade dress is functional in the traditional sense, *i.e.,* whether "it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Labs.,* 456 U.S. at 850 n. 10, 102 S.Ct. 2182. "A design feature of a particular article is 'essential' only if the feature is dictated by the functions to be performed; a feature that merely accommodates a useful function is not enough." *Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 975 (2d Cir.1987) (citation omitted). A "design feature 'affecting the cost or quality of an article' is one which permits the article to be manufactured at a lower cost, or one which constitutes an improvement in the operation of the goods." *Id.* (citations omitted). As part of this inquiry, the Court must also consider alternative design possibilities, "along a continuum":

> On one end, unique arrangements of purely functional features constitute a functional design. On the other end, distinctive and arbitrary arrangements of predominantly ornamental features that do not hinder potential competitors from entering the same market with differently dressed versions of the product are non-functional and hence eligible for trade dress protection. In between, the case for protection weakens the more clearly the arrangement of allegedly distinctive features serves the purpose of the product (including maintenance of low cost), especially where the competitor copying such features has taken some significant steps to differentiate its product.

*Id.* at 977.

■ In this case, the Court, resolving doubts and ambiguities in favor of Maharishi as the non-movant, especially in view of the uncertainty surrounding the functionality element following *TrafFix,* concludes that Maharishi has satisfied its burden of raising at least a factual issue as to whether the peculiar arrangement of Snopants features is nonfunctional under the traditional definition. Maharishi argues, for

example, that the contrasting pocket lining color on the pants serves no functional purpose, nor does the off-center placement of the double cord locks. Abercrombie counters that contrasting pocket lining color frees the manufacturer from having to match the fabric color, and that the placement of the cord locks strategically avoids interfering with one's arms. These are fact questions. More fundamentally, the Court, keeping in mind that the trade dress must be views *as a whole,* concludes that, under the *Stormy Clime* continuum, a reasonable juror could conclude that the Snopants trade dress, taken as a whole, is an "arbitrary arrangement[ ] of predominantly ornamental features." *Id.*

On the question of aesthetic functionality, the Court finds substantial guidance from the Second Circuit's decision in *Knitwaves.* In that case, Knitwaves, Inc. ("Knitwaves"), a children's clothing manufacturer, created a Leaf Sweater and a Squirrel Cardigan. 71 F.3d at 999. Soon after, Lollytogs Ltd. ("Lollytogs") introduced a competing line of sweaters, "including a similar-looking Leaf Sweater and Squirrel Cardigan admittedly copied from Knitwaves' sweaters." *Id.* After a bench trial, the district court awarded Knitwaves damages for trade dress infringement. *Id.* The Second Circuit applied the "alternate designs test" in rejecting Lollytogs' argument on appeal that the Knitwaves trade dress was aesthetically functional: "According trademark protection to Knitwaves' designs would not preclude Lollytogs from using fall colors or motifs, squirrels or leaves. It would preclude only the

use of designs so similar as to create a likelihood of confusion." *Id.* at 1006.[9] A reasonable factfinder could apply that same analysis to the present case and conclude: were the Court to grant trade dress protection to the Snopants trade dress, as narrowly formulated, Abercrombie would be free to design nearly all varieties of military-style pants as long as the pants were not confusingly similar to Snopants. Accordingly, the Court finds that under both the traditional and *Qualitex* definitions of functionality, Maharishi has raised a sufficient fact question as to whether its trade dress is nonfunctional, aesthetically and otherwise.

■ A finding that Maharishi has satisfied its burden of production with regard to the issue of functionality, however, does not resolve this motion. As mentioned above, Maharishi would also have to establish the two other prerequisites of trade dress infringement, likelihood of confusion and distinctiveness. In connection with those elements, Abercrombie has advanced concrete evidence and compelling arguments on the distinctiveness issue (specifically, on the consistency of the trade dress) to support a finding that there is no material factual issue in dispute, and, as explained below, Maharishi has not sufficiently countered those points. The motion for summary judgment must be granted on the trade dress claim on this ground.

Abercrombie argues that the trade dress does not have a consistent overall look because Snopants contain only some of the nine features at issue.[10] In addition to the

9. The panel reversed and rendered judgment in favor of Lollytogs on the trade dress claim on the more fundamental ground that the asserted trade dress was not distinctive: "As Knitwaves' objective in the two sweater designs was primarily aesthetic, the designs were not primarily intended as source identification. Those sweater designs therefore fail to qualify for protection of trade dress inher-

ent in product design." 71 F.3d at 1009. Abercrombie has not argued in this motion that the primary purpose of the Snopants trade dress is aesthetic, and the Court does not address that issue.

10. One glaring example of the inconsistency, according to Abercrombie, is that only some Snopants contain Asian embroidery. The

divergent pants styles pictured in Maharishi's complaint, Abercrombie directs the Court's attention to six "Snopants" which Abercrombie has entered into the record as support for the proposition that a number of Snopants do not bear some of the features of the asserted trade dress.[11] Those pants lack, for example, knee darts, a pocket near the pant hem, and pocket linings of contrasting color. The placement of elasticized cord locks and the styling of the pockets varies among the pants. The Court notes additionally that these pants apparently come in a wide variety of colors, patterns, and fabrics, and some have elaborate patterns which do not appear to be "Asian-themed."

 Maharishi does not dispute this lack of consistency, but instead argues that it is only seeking trade dress protection for Classic Snopants. As explained above, however, that assertion simply comes too late for the Court to consider. The Court agrees with Abercrombie that no reasonable factfinder would find sufficient consistency in the Snopants line, and therefore Maharishi is not entitled to trade dress

protection for the Snopants line as a matter of law. *Cf. Walt Disney Co.*, 830 F.Supp. at 766–68 (denying trade dress protection to Disney's Classic Animated Features line of videocassettes because the overall look of the video packaging was inconsistent).[12]

### B. *UNFAIR COMPETITION*

 Maharishi asserts a federal unfair competition claim under § 43 of the Lanham Act (the same subsection providing the basis for its trade dress claim) and a state common law unfair competition claim, both arising from these same facts.[13] For the federal claim, Maharishi must show (1) that its mark (even though unprotectable) has acquired a secondary meaning and (2) that there is a likelihood of confusion between its mark and Abercrombie's mark. *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 150 (2d Cir.1997). Abercrombie may nevertheless escape liability by demonstrating that it has used every reasonable means to avoid confusion as to the source of the marks. *Id.* The New York common law claim

---

Court disagrees. Because the trade dress as articulated only mentions that the pants "sometimes" contain the embroidery, Maharishi's trade dress is consistent throughout the line, at least in the trivial sense that all Snopants either have, or do not have, the embroidery. In any event, as explained, *supra*, the Court will not consider the embroidery as part of the asserted trade dress.

11. The six pants are not labeled as "Snopants" (although neither is the pair of Classic Snopants in the record, *see supra* note 5), but they are somewhat similar to the Snopants photos in the complaint. Two contain a tag identifying a "Snocord" system with "patents pending." The Snocord system, apparently referring to the elasticized waist cinches, appears on four of the six pants.

12. If the Court were to delete the elements of the trade dress which are not consistent within the Snopants line, the remaining trade

dress would, roughly speaking, pertain to all roll-up pants with elasticized cinch devices. That articulation would plainly be generic, not distinctive, because it would cover a very broad range of pants and would be composed of commonly-used elements in the industry. *See Jeffrey Milstein*, 58 F.3d at 32 ("[T]he fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea."). Trade dress law does not protect a "generalized type of appearance." *Id.*

13. Maharishi has also included a claim styled as "unfair competition" under N.Y. Gen. Bus. Law § 360–1, New York's anti-*dilution* statute. That claim fails for the same reason that the other dilution claims fail, as explained *infra*, notwithstanding the fact that Maharishi has chosen to attach the broader label "unfair competition."

"closely resemble[s]" this federal claim "except insofar as 'the state law claim may require an additional element of bad faith or intent.'" *Girl Scouts v. Bantam Doubleday Dell Publ'g Group, Inc.*, 808 F.Supp. 1112, 1131 (S.D.N.Y.1992) *aff'd* 996 F.2d 1477 (2d Cir.1993) (citation omitted). Abercrombie argues that these claims are merely restatements of the trade dress claim and should be dismissed, as well. The Court agrees.

■■■■ Maharishi, citing *Genesee*, argues that an unfair competition claim may survive a trade dress deemed unprotectable. It is true that unfair competition "is a more broadly conceived tort than its frequent litigation partner, trademark infringement, and there are some instances where a defendant is guilty of competing unfairly without having technically infringed." *Professional Golfers Ass'n of America v. Bankers Life & Cas. Co.*, 514 F.2d 665, 671 (5th Cir.1975). Unfair competition "encompass[es] a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another." *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 662 (2d Cir.1979).

At least two Second Circuit cases have found facts supporting an unfair competition claim even where the underlying trademark was unprotectable, but those cases are highly distinguishable from the facts here. In *Genesee*, Genesee Brewing Company ("Genesee") alleged that Stroh Brewing Company's ("Stroh") use of the phrase "Honey Brown" to describe its beer constituted trademark infringement. 124 F.3d at 137. Although the Court decided that Genesee's mark was generic, and thereby not protectable as a trademark, that finding did "not preclude a finding that Stroh has violated the Lanham Act by engaging in unfair competition." *Id.* at 149. Specifically, the Court

held Stroh could not "market[] its beer in such a way as to lead consumers to believe that they are getting Genesee's product," notwithstanding the fact that Stroh had a right to use the phrase "Honey Brown." *Id.* at 150. The panel suggested that there was evidence of unfair competition in the record. *Id.* at 151. For example, (1) customers have long associated the phrase "Honey Brown" with Genesee's beer; (2) Stroh specifically emphasized the words "Honey Brown" on its label, similar to Genesee's label; (3) Stroh arranged to give its coupons to supermarket purchasers of Genesee's beer; and (4) bars which listed "Honey Brown" on their menus replaced Genesee's more expensive product with Stroh's, without changing their menus. *Id.* at 151.

In *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95 (2d Cir.1989), the Second Circuit held that the phrase "Murphy bed" (a bed which folds into a wall or closet) had become generic and that plaintiff Murphy Door Bed Company ("Murphy Co."), the original Murphy bed manufacturer, could not monopolize that phrase as a trademark. *Id.* at 101. The panel held that, although defendant "did not engage in unfair competition by selling and advertising his products as Murphy beds," defendant did engage in unfair competition "by passing off products of his own manufacture as Murphy Co. products." *Id.* at 102. Specifically, defendant, a former distributor for Murphy Co., continued to distribute beds under the same invoices to the same customers, even though defendant substituted its own beds instead of Murphy Co.'s. *Id.*

■■■■ What distinguishes *Murphy* and *Genesee* is that, unlike those cases, here there is no evidence of unfair competition grounded independently on wrongful conduct *distinct from the alleged trade dress infringement.* As discussed above, Ma-

harishi's product contained no mark that was uniquely source-identifying and upon which much of its goodwill rested. Rather, its garments are comprised of a combination of arguably functional elements on a generic product. A competitor who chose to copy some or all of those features within the bounds of permissible competition would have no clear notice of what combination of design elements would violate a claimed distinctive appearance associated in the market with the source of the product. In *Murphy* and *Genesee*, by contrast, the defendants took affirmative steps to profit from or knowingly diminish the plaintiffs' established good will. The Court is wary to interpret § 43(a) as supporting such a broad and unprecedented theory of unfair competition which would effectively swallow the jurisprudence of trade dress infringement. Accordingly, the Court dismisses Maharishi's claim for federal unfair competition. Similarly, because here the *only* basis for Maharishi's unfair competition claims is the infringement upon the alleged trade dress, in which the Court has determined Maharishi has no proprietary right, the Court dismisses the state unfair competition claim, as well. *See Gloriosa*, 2002 WL 1492197, at *7 ("There being no trade dress that qualifies for protection and thus no trade dress in which the plaintiff has a proprietary right, the plaintiff cannot make out a claim for unfair competition based on the bad faith infringement of that trade dress.").

## C. *DECEPTIVE TRADE PRACTICES*

■ The Court dismisses Maharishi's deceptive trade practices claim under N.Y. Gen. Bus. Law § 349 because there is no allegation, let alone evidence, of public harm. "Claims that arise out of a trademark infringement action, and disputes between competitors where the core of the claim is harm to another business as opposed to consumers, both constitute situations which courts have found to reflect a public harm that is too insubstantial" for purposes of a claim under § 349. *Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 277 F.Supp.2d 269, 273 (S.D.N.Y.2003).

## D. *DILUTION*

The Court also dismisses Maharishi's claims of dilution under federal and state law because the Court has determined that there is no protectable trade dress to be diluted in the first place. Federal law only provides a dilution cause of action to "the owner of a famous mark." 15 U.S.C. § 1125. Maharishi has not demonstrated that it owns a protectable mark, much less that it is "famous" within the meaning of the statute. "To prevail on a trade dress dilution claim under" New York state law "a person must prove ... ownership of a distinctive mark...." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 117 F.Supp.2d 360, 369 (S.D.N.Y.2000). Again, Maharishi has not shown it is entitled to protection of its trade dress.

## E. *FALSE ADVERTISING*

■ Abercrombie affixed a tag to its Shi Dings stating, "Our Most Original Pant Since 1892 ... Pure Abercrombie & Fitch design and fit." Maharishi argues that the tag constitutes false advertising under § 43(a) of the Lanham Act because the pants are neither "original," nor "pure[ly]" Abercrombie's creation. To establish a § 43(a) false advertising claim, the plaintiff must demonstrate that "(1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse consumers." *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir.1995). The plaintiff must also show "that the defendants misrepresented an inherent quality or characteristic of the product." *National Basketball Ass'n v. Motorola, Inc.*, 105

F.3d 841, 855 (2d Cir.1997) (citation and internal quotation marks omitted). "Subjective claims about products, which cannot be proven either true or false are not actionable" because they are mere "puffing." *Lipton,* 71 F.3d at 474 (citation and internal quotation marks omitted).

■ The claim that Shi Dings are Abercrombie's "Most Original" pants is obvious puffery and therefore not actionable. There is no way to prove that one pair of Abercrombie pants is more or less "original" than another pair of Abercrombie pants. The assertion that Shi Dings are "Pure Abercrombie & Fitch design and fit" is more non-actionable puffery. Again, there is no way to prove to what extent the design and fit of Shi Dings is "pure" or "impure" Abercrombie, especially where, as here, Abercrombie indisputably manufactured and sold the pants. *Cf. Cytyc Corp. v. Neuromedical Sys. Inc.,* 12 F.Supp.2d 296, 300–01 (S.D.N.Y.1998) (lab machine's claim of "unprecedented clarity" held to be non-actionable puffery).

## F. *COPYRIGHT INFRINGEMENT*

■ Maharishi claims that the fiery dragon embroidery on the leg of one particular Snopants style is protected under the laws of the United Kingdom and that Abercrombie's dragon embroidery on its Shi Dings, along with the dragon image on the accompanying hang tag, violate the Copyright Act, 15 U.S.C. § 501.[14] Although clothes are generally not copyrightable, fabric designs, considered "writings," are copyrightable. *See Folio Impressions, Inc. v. Byer California,* 937 F.2d 759, 763 (2d Cir.1991). "A plaintiff with a valid copyright proves infringe-

ment by demonstrating that: (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's." *Fisher-Price, Inc. v. Well–Made Toy Mfg. Corp.,* 25 F.3d 119, 122–23 (2d Cir.1994) (emphasis in original). Abercrombie argues that, as a matter of law, there is no substantial similarity among the dragons. The Court agrees.

■ As an initial matter, the scope of copyright protection extends "only to the work's particular expression of an idea, not to the idea itself." *Folio Impressions,* 937 F.2d at 765. In *Folio,* the Second Circuit, in deciding whether one textile rose pattern, the Baroque Rose, infringed upon another, the Folio Rose, held that "what is protected in this case is the Folio Rose itself and the way in which *that* rose is arranged; the copyright umbrella does not cover the idea of arranging roses generally in a straight line pattern." *Id.* (emphasis in original). Similarly, in this case, only the particularized expression of the dragon is protectable, not the idea of the dragon itself or even the idea of putting a dragon on pants.

No reasonable factfinder could conclude that the dragons at issue are substantially similar in the relevant respect because virtually all of the similarity is attributable to the fact that the images are all dragons. *See Mattel, Inc. v. Azrak–Hamway Int'l, Inc.,* 724 F.2d 357, 360 (2d Cir.1983) ("Though the dolls' bodies are very similar, nearly all of the similarity can be attributed to the fact that both are artist's ren-

---

**14.** The parties do not dispute that the federal Copyright Act applies even though Maharishi's rights originate from the United Kingdom. *See Bridgeman Art Library, Ltd. v. Corel Corp.,* 25 F.Supp.2d 421, 425 (S.D.N.Y.1998) ("In view of the United States' accession to the Berne Convention and the Universal Copyright Convention, a foreign national ... may seek copyright protection under the Copyright Act although the source of its rights lies abroad.") (footnotes omitted).

derings of the same unprotectable idea – a superhuman muscleman crouching in what since Neanderthal times has been a traditional fighting pose."). Most notably, Maharishi's dragon is camouflage, and Abercrombie's is yellow and scaley. The body of Maharishi's dragon is oriented down the pant leg, with the head below, while Abercrombie's dragon is oriented up the pat leg, with the head above. The Maharishi dragon has four legs; the Abercrombie dragon has only two. The "dragon" image on the Shi Dings hang tag looks more like some type of cat-human-lizard hybrid and is so obviously different from Maharishi's dragon as to not warrant more discussion.

Maharishi directs the Court's attention to *Knitwaves*, in which the Second Circuit, after noting a list of differences between the sweater patterns at issue, stated: "These differences in detail, while requiring considerable ink to describe, do little to lessen a viewer's overwhelming impression that the two Lollytogs sweaters are appropriations of the Knitwaves sweaters." 71 F.3d at 1004. Maharishi emphasizes that merely being able to list differences in the image should not suffice, especially on a motion for summary judgment.

The Court considers *Knitwaves* highly distinguishable, especially in comparing the similarity in the images appended to that opinion to the similarity among the exhibits in this case. In *Knitwaves*, the Court noted that "the differences pale in comparison to the overwhelming impression of similarity" and also stated, "An observer viewing the sweaters side by side cannot help but perceive them as coming from one creative source." *Id.* at 1004–05. Here, the overwhelming impression is of *dis* similarity, and the Court cannot imag- ine that the dragon images (as distinguished from the mere idea of putting a dragon on pants) came from the same creative source. The Court's noted differences are merely illustrative of a factual finding which is difficult to explain beyond saying that the dragons are obviously and substantially dissimilar.

### G. *MORAL RIGHTS*

 Maharishi asserts that the alleged dragon-copying is a violation of its "moral rights," or rights of attribution and integrity, under the Visual Arts Rights Act ("VARA"), 17 U.S.C. § 106A. That claim must fail for the same reasons that the Copyright Act claim fails. Additionally, that statute is available only to "author[s] of a work of visual art." *Id.* The dragon images at issue here plainly do not qualify as "work[s] of visual art" under the statute. *See* 17 U.S.C. § 101 (defining "work of visual art," in relevant part as "a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author ...").

### H. *LEAVE TO AMEND*

 Although generally disfavored,[15] the Court has discretion to grant a party leave to amend its complaint even after that complaint is dismissed on summary judgment. In this case, the Court finds reason to do so. First, the Court recognizes that, because of deficiencies in the complaint described above, framing the issues has proved difficult and to a large extent overshadowed resolving those issues. It is conceivable that a properly framed complaint might raise triable is-

---

**15.** *See, e.g., Freeman v. Continental Gin Co.,* 381 F.2d 459, 469–70 (5th Cir.1967) ("Much of the value of summary judgment procedure in the cases for which it is appropriate ... would be dissipated if a party were free to rely on one theory in an attempt to defect a motion for summary judgment and then, should that theory prove unsound, come back long thereafter and fight on the basis of some other theory.")

sues with regard to some of the claims that pose the difficulties discussed above, although in much more limited scope. Second, the Court notes that, because Abercrombie insisted on proceeding with its motion for summary judgment before it had sought any discovery, discovery in this case was relatively modest. Ordinarily, the type of challenge to the complaint mounted here arises in the context of Rule 12 motions for dismissal for failure to state a claim or for judgment on the pleadings, in which case the Court routinely grants leave to replead unless it determines that any amendment would be futile. Accordingly, the Court shall stay the entry of judgment in this case for 30 days to allow Maharishi to consider whether it is able to remedy the defects with respect only to its claims for trade dress infringement, unfair competition and trade dress dilution, and, if so, to file a motion for leave to amend the complaint. In the event Maharishi fails to file a motion for leave to amend in that time, or otherwise indicates to the Court that it elects not to do so, the Court will issue an amended and final judgment in this case in favor of Abercrombie.

### IV. *ORDER*

For the reasons discussed, it is hereby

**ORDERED** that the motion of defendants, Abercrombie & Fitch Company and Abercrombie & Fitch Stores, Inc., (collectively, "Abercrombie") for summary judgment dismissing all of the claims of the complaint herein is granted and the complaint is dismissed; it is further

**ORDERED** that entry of judgment shall be stayed for thirty (30) days from the date of this Order to permit plaintiff Maharishi Hardy Blechman Ltd. ("Maharishi") to file a motion for leave to amend its complaint with respect to its claims for trade dress infringement, unfair competition, and trade dress dilution. In the event Maharishi fails to file such a motion,

or otherwise indicates to the Court that it elects not to do so, the Court shall issue an amended judgment in favor of Abercrombie as to all claims.

**SO ORDERED.**